1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| EVANSTON INSURANCE COMPANY, an Illinois Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>HARRIS SLIWOSKI LLP, a Limited Liability Partnership, f/k/a HARRIS BRICKEN SLIWOSKI LLP; HILARY BRICKEN; AND JOHN B. MCDONALD,<br><br>Defendants. | No.<br><br>COMPLAINT FOR DECLARATORY RELIEF, BREACH OF CONTRACT, AND RESTITUTION/UNJUST ENRICHENT |

Plaintiff alleges as follows:

**THE PARTIES, JURISDICTION, AND VENUE**

1.      Plaintiff, Evanston Insurance Company ("Plaintiff"), is an Illinois Corporation with its principal place of business and center of operations in Rosemont, Illinois.

2.      Defendant, Harris Sliwoski LLP f/k/a Harris Bricken Sliwoski LLP ("Defendant"), is a Limited Liability Company organized and existing under the laws of the State of Washington and doing business in Washington, with its principal place of business in Seattle, Washington.  Harris Sliwoski LLP is a law firm.

COMPLAINT – 1



1000 SECOND AVENUE, SUITE 2050
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 623-4100
FAX: (206) 623-9273

3.      Defendant, Hilary Bricken ("Bricken"), an individual, and at various times mentioned herein was a Partner of Defendant practicing law in the State of Washington, and was acting in the course and scope of employment for Defendant as an agent, employee, and/or Partner.

4.      Defendant John B. McDonald, an individual, and at various times mentioned herein was a Partner of Defendant, practicing law in the State of Washington and California, and was acting in the course and scope of employment for Defendant as an agent, employee, and/or Partner.

5.      Vincent Sliwoski, an individual, is a Partner with Defendant and a resident of Portland, Oregon.

6.      Daniel Harris, an individual, is a Partner with Defendant and a resident of Seattle, Washington.

7.      Based on information and belief, all other Partners of Defendant are residents of either California, Arizona, Oregon, Utah, or Washington.

8.      The jurisdiction of this court over the subject matter of this action is predicated on 28 U.S.C. Section 1332(a) (diversity jurisdiction).  The amount in controversy exceeds $75,000.00, exclusive of interest and costs.  Venue is proper in this district pursuant to 28 U.S.C. Section 1391(a), because the Defendant is located within this District.

## **SUMMARY OF THIS DISPUTE**

9.      Plaintiff and Defendants are parties to a contract of insurance, Lawyers Professional Liability Insurance Policy # MKLV5PLA000546 (the "Policy"), a true and correct copy of which (including the Endorsements thereto and the Application therefor) is attached hereto as **Exhibit "A."**

10.      In this action, Plaintiff:

(A)      Seeks a judicial declaration to the effect that the Policy does not provide any coverage to Defendants for a claim asserted against it in the amount of

COMPLAINT – 2

WILSON
SMITH
COCHRAN
DICKERSON

1000 SECOND AVENUE, SUITE 2050
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 623-4100
FAX: (206) 623-9273

$31,076,396.85 made by the Republic of Haiti (the "Republic") on October 12, 2023, which was followed by a Complaint filed on December 1, 2023 by the Republic against Defendants in the Supreme Court of the State of New York (See **Exhibit "B"**), which was removed to the United States District Court for the Southern District of New York on January 9, 2024 (hereinafter collectively referred to as the "Claim"); and,

(B)    Asserts a breach-of-contract claim against Defendants based upon Defendants' material breach of the Policy with respect to the Claim by submitting a materially false Application for the Policy that failed to disclose Defendant's knowledge of the circumstances alleged in the Claim.

(C)    Reserves its right to recoup the defense costs it has incurred or may incur in the future in the event of a final determination by this Court that the Policy does not provide coverage for the Claim.

## FACTUAL BACKGROUND

**A.    The Claim:**

11.    In November 2020, Preble-Rish Haiti, S.A. ("Preble-Rish") commenced arbitration against the Republic and its Bureau de Monetisation des Programmes d'Aide au Developpement ("BMPAD"), via Notice of Demand for Arbitration, claiming damages for the breach of various contracts dated May 13, 2020, and providing for the supply by Preble-Rish of fuel to BMPAD for use in Haiti. The result of the Arbitration was that an Award was issued in favor of Preble-Rish in the amount of $28,184,756.65 against the Republic and BMPAD, jointly and severally, finding, among other things, that the Republic of Haiti and BMPAD breached the contracts. The Award was judicially confirmed by the United States District Court, and on July 20, 2023, the District Court issued a final judgment against the Republic of Haiti and BMPAD in the amount of $31,076,396.85, inclusive of pre-judgment interest.

COMPLAINT – 3

12.     Subsequently, on October 12, 2023, Defendant Harris Sliwoski LLP forwarded to Plaintiff a letter stating that a demand was being made against it by the Republic for $31,076,396.85 based upon Defendants' unauthorized and unsuccessful representation of the Republic in the Arbitration which resulted in an Award against the Republic and BMPAD.

13.     The Republic filed a Complaint against Defendants on December 1, 2023, in the Supreme Court of the State of New York (which was removed to federal court on January 9, 2024), asserting essentially the same facts alleged in its October 12, 2023, demand.

14.     The Claim asserts various wrongful acts and omissions by Defendants constituting malpractice in connection with Defendants' purported representation of the Republic - two of which are the subject of this Declaratory Relief and Breach of Contract action.

15.     First, the Republic contends that Defendants were never retained as its counsel. On December 4, 2020, Bricken, a former Partner with Defendant Harris Sliwoski LLP, represented to the arbitrators that Defendants were in fact counsel for the Republic. However, John McDonald, former attorney, agent, and employee of Defendant Harris Sliwoski LLP acknowledged in a letter to the Second Circuit dated February 22, 2022, that Defendants had learned in July 2021 (prior to the effective Policy Period) that they had not been retained as counsel for the Republic; yet Defendants purportedly continued to represent the Republic thereafter.

16.     Second, as was known by Defendants prior to the inception of the Arbitration, the Republic was never a party to the Arbitration Agreement. Yet, shortly after Preble-Rish commenced arbitration, the Republic filed a Petition in the Supreme Court of the State of New York seeking to stay the arbitration upon various procedural grounds, none of which mentioned that the Republic was not a party to the Arbitration Agreement.

17.     The Supreme Court of the State of New York denied the Petition stating, among other things, "it is beyond dispute that the parties freely and unequivocally agreed to arbitrate

COMPLAINT – 4

WILSON
SMITH
COCHRAN
DICKERSON

1000 SECOND AVENUE, SUITE 2050
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 623-4100
FAX: (206) 623-9273

all their disputes in New York." The Order by the Court dismissing the Petition was affirmed on appeal.

18.     Moreover, when the Republic objected to the Award stating that it was not a party to the arbitration agreement, the Arbitration Panel had already found that the Republic had waived this defense by not timely asserting it.

19.     Plaintiff appointed defense counsel Tyler Jay Lory of Clausen Miller, which was agreed to by Defendant Harris Sliwoski LLP, to defend against the Claim.

20.     Shortly thereafter, on November 10, 2023, Plaintiff sent Defendant Harris Sliwoski LLP a letter acknowledging receipt of the tender, and fully reserving all of Plaintiff's rights under the policy, at law, and in equity, including the right to terminate coverage at any time Plaintiff deems appropriate and to seek the return of any defense costs paid on Defendants' behalf to defense counsel.

21.     On December 1, 2023, the Republic filed a Complaint against Defendants in the Supreme Court of the State of New York alleging causes of action for Legal Malpractice, Negligence, and Violation of Judiciary Law, section 487. The Complaint filed by Plaintiff was removed to the United States District Court for the Southern District of New York on January 9, 2024.

**B.     Defendants' Materially False Application for the Policy:**

22.     On October 11, 2022, Defendants submitted their Application for the Policy, which was completed and signed by Vincent Sliwoski, who at the time, was a Partner with Defendant.

23.     In the Application on page 9, Defendants answered "No" to the following question: "After inquiry, is any person or entity proposed for this insurance aware of any fact, act, error, omission, personal injury, incident, circumstance, or situation that could result in any claim under the proposed insurance, irrespective of the actual validity of the claim?"

COMPLAINT – 5

WILSON
SMITH
COCHRAN
DICKERSON

1000 SECOND AVENUE, SUITE 2050
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 623-4100
FAX: (206) 623-9273

24.     This response was false in that 1) Defendants acknowledged in a letter to the Second Circuit dated February 22, 2022 (before the effective Policy Period) that it had learned in July 2021 (again, prior to the effective Policy Period) that it had not been retained as counsel for the Republic; 2) Defendants knew that a Partial Final Award had been issued on August 6, 2021, granting Preble-Rish's Petition for a pre-award security against the Republic; and 3) Defendants knew that they had not asserted  the Republic's contention that the Republic was not a party to the Arbitration Agreement – all of which  constituted a fact, act, error, omission, incident, circumstance, or situation that could result in claim, irrespective of the actual validity of the claim.

**C.     The Policy and Its Relevant Terms and Conditions:**

25.     In reliance on the representations in the Application, Plaintiff issued the Policy to Defendants for the Policy Period of October 31, 2022, to October 31, 2023. The Policy provides limits of liability in the amount of $3,000,000, with a $50,000 deductible for "damages" by reason of a "wrongful act" arising out of "professional legal services," and is subject to various Forms and Endorsements, which impact the coverage issues upon which Plaintiff's reservation of rights is based. Plaintiff's coverage position is based upon, among other things, the following provisions of the Policy:

**<u>The Insuring Agreement</u>**

26.     The relevant Professional Liability Insuring Agreement, which sets forth the basic scope of coverage (if any) available under the Policy, subject to its other terms and conditions and applicable law, provides as follows:

**A. Professional Liability Coverage**

The Company shall pay on behalf of the **Insured** all sums in excess of the Deductible stated in the Declarations that the **Insured** becomes legally obligated to pay as **Damages** and **Claim Expenses** as a result of a **Claim** first made against the **Insured** during the **Policy Period** or the Extended Reporting Period, if applicable, and reported to the Company pursuant to Paragraph **A.** Claim Reporting Provision under Section **VIII —** Claims, by reason of:

WILSON SMITH COCHRAN DICKERSON

1000 Second Avenue, Suite 2050
Seattle, Washington  98104
Telephone: (206) 623-4100
Fax: (206) 623-9273

1.  A **Wrongful Act** arising out of **Professional Legal Services;**

2.  **Personal Injury** committed by the Insured;
    provided:

    a. The entirety of the **Wrongful Act** or **Personal Injury** happens during the **Policy Period** or on or after the **Retroactive Date**; and

    b. Prior to the effective date of this policy, no **Insured** had any knowledge of such **Wrongful Act** or **Personal Injury**, or any fact, circumstance, situation, or incident which would lead a reasonable person in the **Insured's** position to conclude that a **Claim** was likely.

## Definitions

**B.**   **Claim** means the **Insured's** receipt of either:

1.  A written demand for **Damages**; or

2.  The service of suit or institution of arbitration proceedings against the **Insured**.

\*\*\*

**E.**   **Damages** means the monetary portion of any judgment, award, or settlement; provided, however, Damages shall not include:

1.  Punitive or exemplary damages or any multiplied portions of damages in excess of actual damages, including trebling of damages, except where insurable by law;

2.  The cost of any modifications or changes to the Insured's security measures, procedures, software, or hardware required or agreed to by the Insured to satisfy a judgment, award, or settlement;

3.  Taxes, criminal or civil fines assessed against an Insured, attorneys' fees of a party other than an Insured, or penalties imposed by law;

\*\*\*

**P.**   **Professional Legal Services means services rendered by an Insured:**

1.  As a lawyer, notary public, mediator, arbitrator, title insurance agent, or as an administrator, conservator, executor, guardian, trustee other than a trustee in bankruptcy, or any other similar fiduciary, provided that such services are directly related to the ordinary activities of the **Insured** in their profession as a lawyer, including services performed in a pro bono capacity, and are performed by or on behalf of the Named Insured or any Predecessor Firm; or

COMPLAINT – 7

WILSON
SMITH
COCHRAN
DICKERSON

1000 SECOND AVENUE, SUITE 2050
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 623-4100
FAX: (206) 623-9273

2.     As a director or officer of any bar association, its governing body, or any of its committees, provided that such services were rendered while such **Insured** was a partner, officer, director, principal, shareholder, shareholder of a partner, member, or employee of the Named Insured.

**V.   Wrongful Act** means any act, error, or omission by the **Insured** in rendering or failing to render **Professional Legal Services** for others, and includes **Interrelated Wrongful Acts**.

### Application for Lawyers Professional Liability Insurance (dated August 1, 2022, and signed October 11, 2022)

**NOTICE TO THE APPLICANT - PLEASE READ CAREFULLY**

NO FACT, CIRCUMSTANCE, OR SITUATION INDICATING THE PROBABILITY OF A CLAIM OR ACTION FOR WHICH COVERAGE MAY BE AFFORDED BY THE PROPOSED INSURANCE IS NOW KNOWN BY ANY PERSON(S) OR ENTITY(IES) PROPOSED FOR THIS INSURANCE OTHER THAN THAT WHICH IS DISCLOSED IN THIS APPLICATION.  IT IS AGREED BY ALL CONCERNED THAT IF THERE IS KNOWLEDGE OF ANY SUCH FACT, CIRCUMSTANCE, OR SITUATION, ANY CLAIM SUBSEQUENTLY EMANATING THEREFROM WILL BE EXCLUDED FROM COVERAGE UNDER THE PROPOSED INSURANCE.

\*\*\*

THIS APPLICATION, INFORMATION SUBMITTED WITH THIS APPLICATION, AND ALL PREVIOUS APPLICATIONS AND MATERIAL CHANGES THERETO ARE CONSIDERED PHYSICALLY ATTACHED TO AND PART OF THE POLICY IF ISSUED. THE COMPANY WILL HAVE RELIED UPON THIS APPLICATION AND ALL SUCH ATTACHMENTS IN ISSUING THE POLICY.

**D.     Plaintiff's Reservation of Rights Concerning Coverage for the Claim under the Policy:**

27.     By letter dated November 10, 2023, Plaintiff reserved its rights to deny coverage for the Claim in its entirety pursuant to **Section II - INSURING AGREEMENT 1.b.** The Policy only provides Professional Liability Coverage for a Wrongful Act provided that "prior to the effective date of this policy, no Insured had any knowledge of such Wrongful Act or Personal Injury, or any fact, circumstance, situation, or incident which would lead a reasonable person in the Insured's position to conclude that a Claim was likely."

COMPLAINT – 8

28.     Defendants became aware that they were not retained by the Republic before the effective date of the Policy and admitted so to the Second Circuit. Clearly, by July 21, 2021, a reasonable person would conclude that a Claim against the Defendants on behalf of the Republic was likely and nearly certain by February 22, 2022.

29.     Plaintiff also reserved its rights to deny coverage for the Claim in its entirety on the basis of the signed Application (page 9) which provides that if there is knowledge of any fact, circumstance, or situation, any claim subsequently emanating therefrom will be excluded from coverage under the proposed insurance. Again, per the signed Application, Defendants falsely answered "No" in the Application dated August 1, 2022 (and signed by Vincent Sliwoski on October 11, 2022) when asked whether any person was aware of any fact, act, error, omission, personal injury, incident, circumstance, or situation that could result in any claim under the proposed insurance.

30.     This was false because Defendants acknowledged in a letter to the Second Circuit dated February 22, 2022 (before the effective Policy Period) that it had learned in July 2021 (again, prior to the effective Policy Period) that it had not been retained as counsel for the Republic; 2) Defendants knew that a Partial Final Award had been issued on August 6, 2021, granting Preble-Rish's Petition for a pre-award security against the Republic; and 3) Defendants knew that the Republic was contesting whether the Republic was  a party to the Arbitration Agreement.

31.     Since there is a dispute concerning Plaintiff's coverage position, Plaintiff files this action against Defendants seeking: (A) a judicial declaration confirming that no coverage is available under the Policy for the Claim; and, (B) damages and/or other appropriate relief for Defendants' breach of the Policy.

### COUNT ONE: DECLARATORY RELIEF

32.     Plaintiff hereby incorporates by reference Paragraphs 1 through 31, above, as if fully set forth herein.

WILSON SMITH COCHRAN DICKERSON

1000 SECOND AVENUE, SUITE 2050
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 623-4100
FAX: (206) 623-9273

33.     By virtue of the foregoing matters, an actual and justiciable controversy has arisen and now exists between the parties, within the jurisdiction of the Court, regarding whether coverage is available to Defendants under the Policy for the Claim.

34.     Declaratory relief is both appropriate and necessary in light of the conflicting positions of the parties with respect to the Policy and the Claim.  Plaintiff desires a judicial determination of the Parties' respective rights and obligations in connection with the Policy and the Claim.

35.     For the reasons set forth above, Plaintiff respectfully requests that this Court confirm that no coverage is available to Defendants under the Policy for the Claim because:

(A)     Coverage for the Claim in its entirety is precluded pursuant to **Section II - INSURING AGREEMENT 1.b.** in that Defendants became aware that it was not retained by the Republic before the effective date of the Policy and admitted so to the Second Circuit. Clearly, by July 21, 2021, a reasonable person would conclude that a Claim against the Defendant on behalf of the Republic was likely and nearly certain by February 22, 2022.

(B)     Coverage for the Claim in its entirety is precluded pursuant to the signed Application dated August 1, 2022, wherein Defendants falsely answered "No" when asked whether any person was aware of any fact, act, error, omission, personal injury, incident, circumstance, or situation that could result in any claim under the proposed insurance; and

(C)     In addition to failing to meet their burden to trigger coverage by satisfying the conditions contained in the Insuring Agreement, the Defendants are also precluded by other terms and conditions of the Policy which operate to limit or bar coverage for the Claim, including, without limitation certain Forms and Endorsements.

WILSON SMITH COCHRAN DICKERSON

1000 SECOND AVENUE, SUITE 2050
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 623-4100
FAX: (206) 623-9273

1

## COUNT TWO: BREACH OF CONTRACT

2

36.   Plaintiff hereby incorporates by reference paragraphs 1 through 35 above, as if

3

set forth fully herein.

4

37.   Plaintiff has performed all conditions, covenants, and promises required to be

5

performed on its part except those excused, hindered or prevented by Defendants.

6

38.   Defendants materially breached the terms of the Policy by stating, in response

7

to one specific question in the Application, that they were not aware of any fact, act, error,

8

omission, personal injury, incident, circumstance, or situation that could result in any claim

9

under the proposed insurance.

10

39.   Defendants' response was false for the reasons set forth above, all of which

11

constitute a fact, act, error, omission, incident, circumstance, or situation that could result in

12

claim, irrespective of the actual validity of the claim.

13

40.   The Policy expressly provides that Plaintiff issued the Policy based in part upon

14

reliance on the Application, which, as demonstrated above, was in fact materially false.

15

41.   Plaintiff has been damaged by Defendants' breach of the Policy, in a still

16

undetermined amount according to proof, because those breaches have caused Plaintiff to incur

17

expenses in investigating and responding to the Claim, and subjected Plaintiff to potential

18

exposure in connection with the $31,076,396.85 Claim.

19

42.   As a proximate result of Defendants' material breaches of the Policy, Plaintiff

20

has suffered damages, and continues to suffer damages, in an amount to be proven at trial, but

21

no less than $75,000.00.

22

## COUNT THREE: RESTITUTION/UNJUST ENRICHMENT

23

43.   Plaintiff hereby incorporates by reference paragraphs 1 through 42 above, as if

24

set forth fully herein.

25

26

COMPLAINT – 11

WILSON
SMITH
COCHRAN
DICKERSON

1000 SECOND AVENUE, SUITE 2050
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 623-4100
FAX: (206) 623-9273

44.     Plaintiff reserves its right to recoup the defense costs it has incurred or may incur in the future in the event of a final determination by this Court that the Policy does not provide coverage for the Claim.

45.     Because coverage is not available to Defendants under the Policy, Defendants would be unjustly enriched if they retained the amounts Plaintiff has paid or may pay in the future in defense of the Claim.

46.     As a direct and proximate cause of the unjust enrichment set forth above, Plaintiff sustained damages and is entitled to restitution and for an order requiring Defendants to repay Plaintiff the amounts paid in defense costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Evanston Insurance Company prays for the following relief:

1.     That this Honorable Court should determine and declare the Parties' respective rights and obligations under the Policy and at law;

2.     That this Honorable Court should find and declare that the Policy provides no coverage to Defendants for the Claim, or any sums incurred in connection therewith;

3.     The return of any defense costs paid on Defendants' behalf to their defense counsel in the event there is no coverage;

4.     That this Honorable Court find and rule that Defendants materially breached the terms of the Policy by submitting a materially false Application for the Policy;

5.     Compensatory damages in an amount no less than $75,000.00, the specific amount to be determined at trial;

6.     Costs incurred in this matter; and

7.     Such other and further relief as the Court deems just and proper.


//

//

COMPLAINT – 12

WILSON
SMITH
COCHRAN
DICKERSON

1000 SECOND AVENUE, SUITE 2050
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 623-4100
FAX: (206) 623-9273

1  Dated:  February 15, 2024.

2

3                                        By: *s/Lisa C. Neal*
                                         By: *s/ Sarah L. Eversole*
4                                        Lisa C. Neal, WSBA #25686
                                         Sarah L. Eversole, WSBA #36335
5                                        WILSON SMITH COCHRAN DICKERSON
                                         1000 2nd Avenue, Suite 2050
6                                        Seattle, WA  98104
7                                        Phone: (206) 623-4100
                                         Email: l.neal@wscd.com/eversole@wscd.com
8                                        Attorneys for Plaintiff Evanston Insurance
9                                        Company

10                                       *s/ Michael F. Perlis*
                                         Michael F. Perlis, SBN 95992
11                                       *pro hac vice pending*
                                         Joshua Shayne, SBN 223408
12                                       *pro hac vice pending*
13                                       Kaufman Borgeest & Ryan LLP
                                         21700 Oxnard Street - Suite 1450
14                                       Woodland Hills, CA 91367
                                         Telephone: (818) 880-0992
15                                       mperlis@kbrlaw.com/ jshayne@kbrlaw.com
16                                       Attorneys for Plaintiff Evanston Insurance
                                         Company

17

18

19

20

21

22

23

24

25

26

COMPLAINT – 13

WILSON
SMITH
COCHRAN
DICKERSON

1000 SECOND AVENUE, SUITE 2050
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 623-4100
FAX: (206) 623-9273

# EXHIBIT A


**MARKEL**

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# POLICY CHANGES

This endorsement forms a part of the policy numbered below:                          Policy Change Number: 1

| POLICY NUMBER | POLICY CHANGES EFFECTIVE | COMPANY |
|---|---|---|
| MKLV5PLA000546 | 09/14/2023 | Evanston Insurance Company |

| NAMED INSURED | AUTHORIZED REPRESENTATIVE |
|---|---|
| Harris Sliwoski, LLP | CRC Insurance Services, Inc.<br>50 California Street, Suite 2000<br>San Francisco, CA 94111 |

| COVERAGE PARTS AFFECTED |
|---|
| LAWYERS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART |

The following item(s):

| | | | |
|---|---|---|---|
| ☒ | Insured's Name | ☐ | Insured's Address |
| ☐ | Policy Number | ☐ | Company |
| ☐ | Effective/Expiration Date | ☐ | Insured's Legal Status/Business Of Insured |
| ☐ | Limits/Exposures | ☐ | Premium Determination |
| ☐ | Item(s) listed below added to policy | ☐ | Item(s) listed below deleted from policy |
| ☐ | Payment Plan | ☐ | Additional Interested Parties |
| ☐ | Deductible/Retention | ☐ | Covered Property/Location Description |
| ☐ | Rates | ☐ | Coverage Forms and Endorsements |
| ☐ | Classification/Class Codes | ☐ | Underlying Insurance |

is (are) changed to read as shown below:

**AMENDMENT OF NAMED INSURED**

In consideration of the premium paid, it is hereby understood and agreed that the Named Insured in Item 1. of the Declarations is amended to show the following Named Insured:

**HARRIS SLIWOSKI, LLP**

All other terms and conditions remain unchanged.

The above amendments result in a change in premium as follows:

| ☒ NO CHANGES | ☐ ADDITIONAL PREMIUM | ☐ RETURN PREMIUM |
|---|---|---|

_____
Authorized Representative Signature

**A STOCK COMPANY**



# EVANSTON INSURANCE COMPANY

10275 West Higgins Road, Suite 750
Rosemont, IL 60018

**INSURANCE POLICY**

**Coverage afforded by this policy is provided by the Company (Insurer) and named in the Declarations.**

In **Witness Whereof**, the company (insurer) has caused this policy to be executed and attested and countersigned by a duly authorized representative of the company (insurer) identified in the Declarations.

| | |
|---|---|
| **Secretary** | **President** |

INTERLINE



# EVANSTON INSURANCE COMPANY

## PRIVACY NOTICE

U. S. Consumer Privacy Notice                                               Rev. 1/1/2020

| FACTS | WHAT DOES MARKEL GROUP OF COMPANIES REFERENCED BELOW (INDIVIDUALLY OR COLLECTIVELY REFERRED TO AS "WE", "US", OR "OUR") DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| Why? | In the course of Our business relationship with you, We collect information about you that is necessary to provide you with Our products and services. We treat this information as confidential and recognize the importance of protecting it. Federal and state law gives you the right to limit some but not all sharing of your personal information. Federal and state law also requires Us to tell you how We collect, share, and protect your personal information. Please read this notice carefully to understand what We do. |
| What? | The types of personal information We collect and share depend on the product or service you have with Us. This information can include:<br><br>• your name, mailing and email address(es), telephone number, date of birth, gender, marital or family status, identification numbers issued by government bodies or agencies (i.e.: Social Security number or FEIN, driver's license or other license number), employment, education, occupation, or assets and income from applications and other forms from you, your employer and others;<br><br>• your policy coverage, claims, premiums, and payment history from your dealings with Us, Our Affiliates, or others;<br><br>• your financial history from other insurance companies, financial organizations, or consumer reporting agencies, including but not limited to payment card numbers, bank account or other financial account numbers and account details, credit history and credit scores, assets and income and other financial information, or your medical history and records.<br><br>Personal information does not include:<br><br>• publicly-available information from government records;<br><br>• de-identified or aggregated consumer information.<br><br>When you are no longer Our customer, We continue to share your information as described in this Notice as required by law. |
| How? | All insurance companies need to share customers' personal information to run their everyday business. In the section below, We list the reasons financial companies can share their customers' personal information; the reasons We choose to share; and whether you can limit this sharing. We restrict access to your personal information to those individuals, such as Our employees and agents, who provide you with insurance products and services. We may disclose your personal information to Our Affiliates and Nonaffiliates (1) to process your transaction with Us, for instance, to determine eligibility for coverage, to process claims, or to prevent fraud, or (2) with your written authorization, or (3) otherwise as permitted by law. We do not disclose any of your personal information, as Our customer or former customer, except as described in this Notice. |

| Reasons We can share your personal information | Do We share? | Can you limit this sharing? |
|---|---|---|
| **For Our everyday business purposes and as required by law –** such as to process your transactions, maintain your account(s), respond to court orders and legal/regulatory investigations, to prevent fraud, or report to credit bureaus | Yes | No |
| **For Our marketing purposes –** to offer Our products and services to you | Yes | No |
| **For Joint Marketing with other financial companies** | Yes | No |
| **For Our Affiliates' everyday business purposes –** information about your transactions and experiences | Yes | No |
| **For Our Affiliates' everyday business purposes –** information about your creditworthiness | No | We don't share |
| **For Our Affiliates to market you** | No | We don't share |
| **For Nonaffiliates to market you** | No | We don't share |
| **Questions?** Call (888) 560-4671 or email privacy@markel.com | | |

| Who We are | |
|---|---|
| **Who is providing this Notice?** | A list of Our companies is located at the end of this Notice. |

| What We do | |
|---|---|
| **How do We protect your personal information?** | We maintain reasonable physical, electronic, and procedural safeguards to protect your personal information and to comply with applicable regulatory standards. For more information, visit www.markel.com/privacy-policy. |
| **How do We collect your personal information?** | We collect your personal information, for example, when you<br>    complete an application or other form for insurance<br>    perform transactions with Us, Our Affiliates, or others<br>    file an insurance claim or provide account information<br>    use your credit or debit card<br>We also collect your personal information from others, such as consumer reporting agencies that provide Us with information such as credit information, driving records, and claim histories. |
| **Why can't you limit all sharing of your personal information?** | Federal law gives you the right to limit only<br>    sharing for Affiliates' everyday business purposes – information about your creditworthiness<br>    Affiliates from using your information to market to you<br>    sharing for Nonaffiliates to market to you<br>State laws and individual companies may give you additional rights to limit sharing. See the Other Important Information section of this Notice for more on your rights under state law. |

| Definitions | |
|---|---|
| **Affiliates** | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br>• Our Affiliates include member companies of Markel Group. |
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br>• Nonaffiliates that We can share with can include financial services companies such as insurance agencies or brokers, claims adjusters, reinsurers, and auditors, state insurance officials, law enforcement, and others as permitted by law. |
| **Joint Marketing** | A formal agreement between Nonaffiliated companies that together market financial products or services to you.<br>• Our Joint Marketing providers can include entities providing a service or product that could allow Us to provide a broader selection of insurance products to you. |

| Other Important Information |
|---|
| **For Residents of AZ, CT, GA, IL, ME, MA, MN, MT, NV, NJ, NC, OH, OR, and VA:** Under state law, under certain circumstances you have the right to access and request correction, amendment or deletion of personal information that We have collected from or about you. To do so, contact your agent, visit www.markel.com/privacy-policy, call (888) 560-4671, or write to Markel Corporation Privacy Office, 4521 Highwoods Parkway, Glen Allen, VA 23060.<br><br>We may charge a reasonable fee to cover the costs of providing this information. We will let you know what actions We take. If you do not agree with Our actions, you may send Us a statement. |
| **For Residents of CA:** You have the right to review, make corrections, or delete your recorded personal information contained in Our files. To do so, contact your agent, visit www.markel.com/privacy-policy, call (888) 560-4671, or write to Markel Corporation Privacy Office, 4521 Highwoods Parkway, Glen Allen, VA 23060. We do not and will not sell your personal information.<br><br>For the categories of personal information We have collected from consumers within the last 12 months, please visit: www.markel.com/privacy-policy. |
| **For Residents of MA and ME:** You may ask, in writing, for specific reason, for an adverse underwriting decision. |
| **Markel Group of Companies Providing This Notice:** City National Insurance Company, Essentia Insurance Company, Evanston Insurance Company, FirstComp Insurance Company, Independent Specialty Insurance Company, National Specialty Insurance Company, Markel Bermuda Limited, Markel American Insurance Company, Markel Global Reinsurance Company, Markel Insurance Company, Markel International Insurance Company Limited, Markel Service, Incorporated, Markel West, Inc. (d/b/a in CA as Markel West Insurance Services), Pinnacle National Insurance Company, State National Insurance Company, Inc., Superior Specialty Insurance Company, SureTec Agency Services, Inc. (d/b/a in CA as SureTec Agency Insurance Services), SureTec Indemnity Company, SureTec Insurance Company, United Specialty Insurance Company, Inc. |

POLICY NUMBER: MKLV5PLA000546



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## COMMON POLICY SURPLUS LINES NOTIFICATION
## SUPPLEMENT TO DECLARATIONS

INTERLINE

**MARKEL**®

# EVANSTON INSURANCE COMPANY

## U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – https://www.treasury.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.



**PROFESSIONAL LIABILITY**

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## NOTICE TO POLICYHOLDERS
## COMPANY REPORTING

| Notices | |
|---|---|
| Address notices required to be provided to the Company under this policy to: | |
| CLAIM NOTICES | ALL OTHER NOTICES |
| Markel Claims<br>10275 West Higgins Road, Suite 750<br>Rosemont, IL 60018<br>Phone: 800-362-7535 (800) 3MARKEL<br>Fax: 855-662-7535 (855) 6MARKEL<br>E-mail: newclaims@markelcorp.com | Markel West Insurance Services, a division of Markel Service, Incorporated (#0D95581)<br>21600 Oxnard Street, Suite 900<br>Woodland Hills, CA, 91367<br>Telephone: (818) 595-0600<br>Fax: (866) 730-2529 |

# Markel + Hinshaw

## Lawyering law

Markel has partnered with Hinshaw to update our risk management services that cater to law firms and lawyers.



### Consultation

Your legal malpractice insurance plan includes easy access to authorities on professional responsibility and loss prevention. Consult confidentially with a senior risk management attorney on thorny issues that can—but don't have to—turn into bigger problems and/or costly claims. We provide advice to help:

- Resolve a complex conflict situation
- Communicate ethically and effectively a potential error to a client
- Terminate a client relationship
- Respond to a demand for a client file
- Represent a client with diminished capacity



### Risk management resources

Additional program benefits also include access to:

- On-demand ethics CLE programs
- A robust and growing e-library of risk management forms, checklists, rules, guides, and articles

Visit lawyeringlaw.com to learn more and take advantage of these benefits at no added cost to you.



### To create a subscriber proi le on lawyeringlaw.com:

- Go to lawyeringlaw.com
- Click the "Create new profile" button (you will need your policy number to create a new profile)
- Complete the form and click the "Submit" button
- You will receive an e-mail confirming your registration







# EVANSTON INSURANCE COMPANY

## LAWYERS PROFESSIONAL LIABILITY INSURANCE DECLARATIONS

THIS IS A CLAIMS MADE POLICY. THE AMOUNTS INCURRED AS CLAIM EXPENSES WILL REDUCE THE LIMITS OF LIABILITY. PLEASE READ THIS ENTIRE POLICY CAREFULLY.

POLICY NUMBER: MKLV5PLA000546                          RENEWAL OF POLICY: MKLV5PLA000395

Named Insured and Mailing Address (No., Street, Town or City, County, State, Zip Code)
Harris Bricken Sliwoski, LLP

DBA: Harris Bricken
600 Stewart St Ste 1200
Seattle, WA, 98101-3160

Policy Period: From  10/31/2022          To  10/31/2023
                        at 12:01 A.M. Standard Time at the address of the Named Insured shown above.

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, THE COMPANY AGREES WITH THE INSURED TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| Limits Of Liability | |
|---|---|
| Each Claim: | $3,000,000 |
| Policy Aggregate: | $3,000,000 |

| Deductible | | | |
|---|---|---|---|
| Each Claim: | $50,000 | Aggregate: | $100,000 |

| Retroactive Date | |
|---|---|
| Retroactive Date: | 10/31/2018 |

| Premium For Policy Period |
|---|
| $87,889.00 |

| Producer Number, Name And Mailing Address |
|---|
| 211138 |
| CRC Insurance Services, Inc. |
| 50 California Street, Suite 2000 |
| San Francisco, CA, 94111 |

| Premium For Extended Reporting Period | | Premium For Non-Practicing Extended Reporting Period | |
|---|---|---|---|
| Additional Premium Percentage | Additional Period | Additional Premium Percentage | Additional Period |
| 100% | 12 months | 100% | 12 months |
| 150% | 24 months | 150% | 24 months |
| 200% | 36 months | 200% | 36 months |
| 300% | 60 months | | |

| Forms And Endorsements |
|---|
| Forms and Endorsements applying to this Policy and made part of this Policy at time of issue: |
| **SEE MDIL 1001 ATTACHED** |

**These Declarations, together with the Policy, Endorsement(s), Notices, Application, and any other attachments complete the above numbered Policy.**

Countersigned: _____11/07/2022_____    By: _____
                              **DATE**                                    **AUTHORIZED REPRESENTATIVE**



POLICY NUMBER: MKLV5PLA000546

# EVANSTON INSURANCE COMPANY

## FORMS SCHEDULE

| FORM NUMBER | FORM NAME |
|---|---|
| MJIL 1000 08 10 | Policy Jacket |
| MPIL 1007 01 20 | Privacy Notice |
| MPIL 1039 01 12 | Surplus Lines Notice |
| MPIL 1083 04 15 | US Treasury Dept's Office Of Foreign Assets Control ("OFAC") Notice |
| MPLA 2000 02 20 | Notice To Policyholders Company Reporting |
| MPLA 2001 08 20 | Markel + Hinshaw Lawyering Law |
| MDLA 2000 05 21 | Lawyers Professional Liability Declarations |
| MDIL 1001 08 11 | Forms Schedule |
| MELA 0001 05 21 | Lawyers Professional Liability Insurance |
| MEIL 1200 02 20 | Service of Suit |
| MEIL 5409 09 10 | Nuclear Energy Liability Exclusion Endorsement (Broad Form) |
| MELA 2201 04 17 | 25% Minimum Earned Premium |
| MELA 2209 04 17 | Mutual Choice Of Defense Counsel |
| MELA 2211 04 17 | Subpoena Assistance |
| MELA 2219 06 20 | Crisis Management Expenses |
| MELA 2229 03 20 | Amended Notary Exclusion |
| MELA 2233 05 21 | Amendment Of Each Claim And Aggregate Limits And Deductibles With Split Retroactive Dates |
| MELA 2242 05 21 | Aggregate Deductible |
| MELA 2301 04 17 | Exclusion - Office Sharing |
| MELA 2308 04 17 | Exclusion - Specified Incident, Claim Or Suit |
| MIL 1212 04 17 - A | Policy Changes - (Amendment of Territory) |
| MIL 1212 04 17 - B | Policy Changes - (Amendment of Limits of Liability - Specified Lawyer(s)) |
| MIL 1214 09 17 | Trade Or Economic Sanctions |
| MELA 2311 11 19 | Exclusion - Social Engineering Incident |



# EVANSTON INSURANCE COMPANY

## LAWYERS PROFESSIONAL LIABILITY INSURANCE

**THIS IS A CLAIMS MADE AND REPORTED POLICY. THIS POLICY REQUIRES THAT A CLAIM BE MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR THE EXTENDED REPORTING PERIOD, IF APPLICABLE, AND REPORTED TO THE COMPANY IN WRITING DURING THE POLICY PERIOD OR THE EXTENDED REPORTING PERIOD, IF APPLICABLE, BUT NO LATER THAN 60 DAYS AFTER THE DATE OF EXPIRATION OF THE POLICY PERIOD OR THE EXTENDED REPORTING PERIOD, IF APPLICABLE.**

**VARIOUS PROVISIONS IN THIS POLICY RESTRICT OR EXCLUDE COVERAGE. PLEASE READ THE ENTIRE POLICY CAREFULLY TO DETERMINE THE INSURED'S RIGHTS AND DUTIES AND WHAT IS AND IS NOT COVERED.**

In consideration of the payment of premium and any applicable deductible, in reliance upon the statements in the application attached hereto and made a part hereof and the underwriting information submitted on behalf of the **Insured**, and subject to the terms, conditions, and limitations of this policy, the Company and the **Insured** agree as follows:

### SECTION I – THE INSURED

**Insured**, either in the singular or plural, means:

**A.** The Named Insured stated in the Declarations or any **Predecessor Firm**;

**B.** Any lawyer who is a past, present, or future partner, officer, director, principal, shareholder, shareholder of a partner, member, or employee of the Named Insured solely for **Professional Legal Services**;

**C.** Any nonlawyer who is a past, current, or future employee of the Named Insured or any **Predecessor Firm** solely while acting on behalf of the Named Insured or any **Predecessor Firm**;

**D.** Any person, professional corporation, or limited liability professional corporation designated as **Of Counsel** solely for **Professional Legal Services**;

**E.** Any lawyer who is designated as a **Temporary Or Leased Professional** solely for **Professional Legal Services**; and

**F.** The heirs, executors, administrators, assigns, and legal representatives of each **Insured** hereinabove in the event of death, incapacity, or bankruptcy of such **Insured**, but only while acting within the scope of their duties as such on behalf of the Named Insured or of the **Insured's** estate.

### SECTION II – INSURING AGREEMENT

**A. Professional Liability Coverage**

The Company shall pay on behalf of the **Insured** all sums in excess of the Deductible stated in the Declarations that the **Insured** becomes legally obligated to pay as **Damages** and **Claim Expenses** as a result of a **Claim** first made against the **Insured** during the **Policy Period** or the Extended Reporting Period, if applicable, and reported to the Company pursuant to Paragraph **A.** Claim Reporting Provision under Section **VIII** – Claims, by reason of:

**1.** A **Wrongful Act** arising out of **Professional Legal Services**; or

**2.** **Personal Injury** committed by the **Insured**;

provided:

    **a.** The entirety of the **Wrongful Act** or **Personal Injury** happens during the **Policy Period** or on or after the **Retroactive Date**; and

    **b.**  Prior to the effective date of this policy, no **Insured** had any knowledge of such **Wrongful Act** or **Personal Injury**, or any fact, circumstance, situation, or incident which would lead a reasonable person in the **Insured's** position to conclude that a **Claim** was likely.

**B. Supplementary Payments**

    **1.**  **Disciplinary Proceedings**

        **a.**  Solely with respect to Section **I** – The Insured, **A.**, **B.**, **D.**, or **F.** (solely as **F.** applies to Section **I** – The Insured **A.**, **B.** or **D.**), the Company will pay all reasonable and necessary legal fees and legal expenses incurred in defending a **Disciplinary Proceeding** first received by the **Insured** during the **Policy Period** and reported to the Company pursuant to Paragraph **A.** Claim Reporting Provision under Section **VIII** – Claims; provided:

            **(1)**  The **Wrongful Act** giving rise to the **Disciplinary Proceeding** happens during the **Policy Period** or on or after the **Retroactive Date**; and

            **(2)**  Prior to the effective date of the first policy issued and continuously renewed by the Company, no **Insured** had any knowledge of such **Disciplinary Proceeding** or any fact, circumstance, situation, or incident which would lead a reasonable person in that **Insured's** position to conclude that a **Disciplinary Proceeding** was likely.

        **b.**  The total of such payment will not exceed $50,000 for all **Disciplinary Proceedings** first received during the **Policy Period** and the Extended Reporting Period, if applicable.

        **c.**  No payment shall be made for any taxes; criminal or civil fines, penalties, or sanctions; registration or licensing fees; or any monetary judgment, award, or settlement of any kind.

    Payments for **Disciplinary Proceedings** shall be in addition to the Limits Of Liability stated in the Declarations, and such payments shall not be subject to the deductible.

    **2.**  **Loss Of Earnings And Expense Reimbursement**

        **a.**  Upon submission to the Company of satisfactory written proof of payment by the **Insured**, the Company shall reimburse the **Insured** for all reasonable and necessary expenses incurred by the **Insured** at the Company's written request for attendance at any arbitration, **Mediation**, deposition, hearing, or trial in connection with a **Claim** to which this policy applies.

        **b.**  The Company shall compensate the Named Insured for loss of earnings solely of an **Insured** who is a lawyer a maximum of $500 per day per covered lawyer to attend at the Company's request any arbitration, **Mediation**, deposition, hearing, or trial in connection with a **Claim** to which this policy applies.

        **c.**  The maximum the Company shall reimburse all **Insureds** for all loss of earnings and expense reimbursements for all **Claims** to which this policy applies and all attendances at the Company's written request is $25,000.

    Reimbursement to the **Insured** shall be in addition to the Limits Of Liability stated in the Declarations, and such payments shall not be subject to the deductible.

**SECTION III – DEFINITIONS**

**A.**  **Bodily Injury** means bodily injury, sickness, or disease sustained by a person, including death resulting from any of these.

**B.**  **Claim** means the **Insured's** receipt of either:

    **1.**  A written demand for **Damages**; or

    **2.**  The service of suit or institution of arbitration proceedings against the **Insured**.

**C.**  **Claim Expenses** means reasonable and necessary amounts incurred by the Company or by the **Insured**, with the prior written consent of the Company, in the defense of that portion of any **Claim** for which coverage is afforded under this policy, including costs of investigation, court costs, costs of bonds to release attachments and similar bonds, but without any obligation of the Company to apply for or furnish any such bonds, and costs of appeals; provided, however, that **Claim Expenses** shall not include:

    **1.**  Salary, wages, overhead, or benefit expenses of or associated with employees or officials of the Named Insured or employees or officials of the Company; or

**2.** Salary, wages, administrative expenses, overhead, benefit expenses, or charges of any kind attributable to any in-house counsel or captive outside counsel for the Named Insured or the Company.

**D.** **Computer System** means:

**1.** Any computer hardware, firmware, software, or any components thereof; and

**2.** The data stored thereon, wherever located, associated input and output devices, data storage devices and repositories, networking equipment, backup facilities, and websites;

that are under the ownership, operation, or control of, or that are contracted or leased by, the Named Insured.

**E.** **Damages** means the monetary portion of any judgment, award, or settlement; provided, however, **Damages** shall not include:

**1.** Punitive or exemplary damages or any multiplied portions of damages in excess of actual damages, including trebling of damages, except where insurable by law;

**2.** The cost of any modifications or changes to the **Insured's** security measures, procedures, software, or hardware required or agreed to by the **Insured** to satisfy a judgment, award, or settlement;

**3.** Taxes, criminal or civil fines assessed against an **Insured**, attorneys' fees of a party other than an **Insured**, or penalties imposed by law;

**4** Sanctions;

**5.** Matters which are uninsurable under the law pursuant to which this policy will be construed; or

**6.** The return, withdrawal, reduction, restitution, or payment of any fees, profits, or charges for services or consideration for any expenses paid to the **Insured** for services or goods.

**F.** **Denial Of Service Attack** means any unlawful or unauthorized attempt by a third party to temporarily or indefinitely overload, hinder, interrupt, or suspend service to a **Computer System** via the internet.

**G.** **Disciplinary Proceeding** means the **Insured's** receipt of any complaint, charge, or investigation commenced or action brought by a bar association, disciplinary board, or other similar entity alleging violations of the rules of professional responsibility, or any other action to limit, suspend, or revoke the **Insured's** license to practice law.

**H.** **Extortion Event** means a credible threat by a third party including, but not limited to, a threat to initiate ransomware or a **Denial Of Service Attack**, threatening or portending:

**1.** Loss or damage to **Private Data**;

**2.** Loss or damage to a **Computer System**; or

**3.** Loss of money, securities, bonds, or any other financial instrument of the Named Insured, solely to the extent that record of such is maintained in digital or electronic format on a **Computer System**.

**I.** **Interrelated Wrongful Acts** means all **Wrongful Acts** that have as a common connection or nexus, any fact, circumstance, situation, event, cause, or transaction, or series of facts, circumstances, situations, events, causes, or transactions.

**J.** **Mediation** means the voluntary process in which an objective third party who is a qualified professional mediator selected by the parties to the **Claim**, with written agreement of the Company, intervenes between the parties in an attempt to achieve settlement of the **Claim**. **Mediation** does not include litigation, arbitration, or any court mandated proceedings.

**K.** **Of Counsel** means any lawyer, professional corporation, or limited liability professional corporation, or any lawyer who is an employee of such professional corporation or limited liability professional corporation who is specifically identified on the application for this policy as Of Counsel, solely while acting on behalf of the Named Insured.

**L.** **Personal Injury** means:

**1.** Libel, slander, or defamation;

**2.** Invasion or infringement of the right of privacy; or

**3.** Malicious prosecution, abuse of process, false arrest, or false imprisonment;

committed in the performance of **Professional Legal Services**.

**M.  Policy Period** means the period from the inception date of this policy to the policy expiration date stated in the Declarations, or its earlier cancellation or termination date.

**N.  Predecessor Firm** means any legal entity which was engaged in the practice of law to whose financial assets and liabilities the Named Insured is the majority successor in interest and which is designated in the application as a Predecessor Firm.

**O.  Private Data** means data in the care, custody, and control of an **Insured** or for which the Named Insured is legally responsible containing any of the following:

   **1.**  An individual's driver license or other state-issued identification number, social security number, unpublished telephone number, or savings account, checking account, credit card, or debit card number;

   **2.**  Nonpublic personal information as defined in the Gramm-Leach-Bliley Act of 1999, as amended, and regulations issued pursuant thereto;

   **3.**  Medical and healthcare information, including protected healthcare information as defined in the Health Insurance Portability and Accountability Act of 1996 (HIPAA), as amended, and regulations issued pursuant thereto;

   **4.**  Private personal information as defined under a **Security Breach Notice Law**;

   **5.**  Private personal information as defined under the law of a country other than the United States, which law is intended to provide for the protection of such private personal information; or

   **6.**  Proprietary information of third parties of commercial value which the Named Insured is legally responsible to maintain in confidence;

   not including any data available to or accessible by the general public.

**P.  Professional Legal Services** means services rendered by an **Insured**:

   **1.**  As a lawyer, notary public, mediator, arbitrator, title insurance agent, or as an administrator, conservator, executor, guardian, trustee other than a trustee in bankruptcy, or any other similar fiduciary, provided that such services are directly related to the ordinary activities of the **Insured** in their profession as a lawyer, including services performed in a pro bono capacity, and are performed by or on behalf of the Named Insured or any **Predecessor Firm**; or

   **2.**  As a director or officer of any bar association, its governing body, or any of its committees, provided that such services were rendered while such **Insured** was a partner, officer, director, principal, shareholder, shareholder of a partner, member, or employee of the Named Insured.

**Q.  Retroactive Date** means the Retroactive Date stated in the Declarations.

**R.  Security Breach Notice Law** means any local, state, federal, or foreign identity theft and privacy protection law, statute, or regulation requiring commercial entities that handle or collect **Private Data** to post privacy policies, adopt specific privacy or security controls and protocols, or notify individuals in the event that **Private Data** has potentially been compromised.

**S.  Temporary Or Leased Professional** means any lawyer, including an independent contractor, solely while acting on behalf of the Named Insured for **Professional Legal Services**.

**T.  Unauthorized Access** means a breach of a **Computer System**, including:

   **1.**  Any intentional violation, interception, use, or misuse of a **Computer System**, whether or not for profit or gain, by any person without the permission, knowledge, or ratification of the **Insured**;

   **2.**  Access to a **Computer System** with the **Insured's** permission, where such permission is the result of fraud or deception, including phishing scams;

   **3.**  Use of a **Computer System** by a party, including a rogue employee, authorized by the **Insured** to use such system, who does so for an unauthorized purpose;

   **4.**  The introduction of viruses, malware, or other programs into a **Computer System** which contain fraudulent or destructive instructions or code, including any inadvertent transmission of such programs to a third party;

   **5.**  An **Extortion Event**; or

   **6.**  A **Denial Of Service Attack**, or the failure to prevent an unauthorized user or code from launching a **Denial Of Service Attack** on a third party through a **Computer System**.

**U.   Unintentional Data Compromise** means:

**1.**   Any computer security incident, including by an **Unauthorized Access**, resulting in the intrusion, breach, compromise, theft, loss, or misuse of **Private Data**;

**2.**   The theft or loss of any paper records containing **Private Data**;

**3.**   The failure of any third party to prevent the unauthorized viewing, copying, or distribution of **Private Data** which the Named Insured has entrusted to such party under a written contract or agreement that specifically requires such party to protect the confidentiality of the **Private Data** so entrusted; or

**4.**   The unintentional breach of the Named Insured's written privacy policy.

**V.   Wrongful Act** means any act, error, or omission by the **Insured** in rendering or failing to render **Professional Legal Services** for others, and includes **Interrelated Wrongful Acts**.

## SECTION IV – EXCLUSIONS

This policy does not apply to any **Claim**:

**A.**   Based upon, arising out of, or in any way involving any:

**1.**   Contract or agreement for, or any other right relating to, payment of or division of any fees or fee apportionment between the **Insured** and any lawyer;

**2.**   Obligation of the **Insured** under any workers' compensation, unemployment compensation, or disability benefits law, or under any similar law;

**3.**   Wrongful termination or other employment related practices;

**4.**   Actual or alleged **Bodily Injury**, or damage to or destruction of any tangible property including loss of use thereof;

**5.**   **Insured's** services or capacity as a securities broker, dealer, financial planner, investment advisor, accountant, real estate broker, or real estate agent;

**6.**   Unlawful discrimination by any **Insured**;

**7.**   Notarized certification or acknowledgement by any **Insured**, in their capacity as a notary public, of a signature without the physical appearance at the time of said notarization before such notary public, of the person who is or claims to be the person signing such instrument; however, this exclusion shall not apply to notarial acts performed by an **Insured** in compliance with applicable state law(s), administrative rule(s), and/or regulation(s) allowing commissioned notaries public to perform notarial acts electronically. For those states with no applicable law(s), administrative rule(s), and/or regulation(s), this exclusion shall not apply to notarial acts performed by an **Insured** in compliance with the National Electronic Notarization Standard as established and adopted by the National Association of Secretaries of States.

**8.**   **Insured's** capacity as a public official, or as an employee of a governmental body, subdivision, or agency; provided, however, this exclusion does not apply to the rendering of **Professional Legal Services** by an **Insured** to a governmental body, subdivision, or agency wherein the Named Insured receives a fee for such **Professional Legal Services**;

**9.**   Actual or alleged violations of the Employee Retirement Income Security Act of 1974 (ERISA) and its amendments or any regulation or order issued pursuant thereto or any similar federal, state, or local law;

**10.**   Deliberately criminal, dishonest, or fraudulent act, error, or omission if a judgment or other final adjudication adverse to the **Insured** establishes that the **Insured** committed a criminal, dishonest, or fraudulent act, error, or omission; provided, however, any criminal, dishonest, or fraudulent act, error, or omission pertaining to any **Insured** under this policy will not be imputed to any other **Insured** under this policy for the purpose of determining the applicability of this exclusion;

**11.**   Actual or alleged violation of any law, whether statutory, regulatory, or common law, respecting any of the following activities: antitrust, business competition, unfair trade practices, or tortious interference in another's business or contractual relationships; or

**12.   Unauthorized Access** or **Unintentional Data Compromise**;

**B.**   Made against any **Insured** by or on behalf of any **Insured** under this policy; provided, however, this exclusion does not apply to a **Claim** arising out of the rendering of **Professional Legal Services** by an **Insured** to such other **Insured** as a client;

**C.** Brought by or on behalf of any entity, of which at the time **Professional Legal Services** were rendered, any **Insured** had more than a 15% ownership interest or control, whether or not such ownership interest or control is financial or otherwise; or

**D.** For conversion, misappropriation, or defalcation of funds or property.

## SECTION V – TERRITORY

The insurance afforded by this policy applies worldwide, except for any country on which the government of the United States of America has imposed trade sanctions, embargoes, or any similar regulations that prohibit the transaction of business with or within such country, provided the **Claim** is first made in the United States of America, its territories, possessions, Puerto Rico, or Canada.

## SECTION VI – LIMITS OF LIABILITY, DEDUCTIBLES, MULTIPLE CLAIMS, AND RELATED CLAIMS

**A. Limits Of Liability**

    **1. Each Claim**

        Subject to Paragraph **2.** below, the liability of the Company for the combined total of **Damages** and **Claim Expenses** for each **Claim** first made against the **Insured** during the **Policy Period** or Extended Reporting Period, if applicable, shall not exceed the Each Claim Limit Of Liability stated in the Declarations. This limit applies as excess over the deductible.

    **2. Policy Aggregate**

        The total liability of the Company for the combined total of all **Damages** and **Claim Expenses** arising out of all **Claims** first made against the **Insured** during the **Policy Period** and the Extended Reporting Period, if applicable, shall not exceed the Policy Aggregate Limit Of Liability stated in the Declarations. This limit applies as excess over the deductible.

**B. Deductibles**

    **1. Each Claim Deductible**

        Subject to Paragraph **2.** below, the Each Claim Deductible stated in the Declarations will be paid by the Named Insured and will be applicable to each **Claim**, other than any Supplementary Payments, and will apply to **Damages** and **Claim Expenses**, whether or not any **Damages** payments are made.

        Such Deductible shall be paid by the Named Insured within 10 days of receipt of written demand by the Company. The determination of the Company as to the reasonableness of the **Claim Expenses** will be conclusive.

    **2. Deductible Credits**

        If a **Claim** is settled without litigation, arbitration, **Mediation**, or court mandated proceedings, the deductible for such **Claim** will be reduced by 75% or $25,000, whichever is less. If the Named Insured and the Company agree to **Mediation** and such **Claim** is settled at **Mediation**, the deductible for such **Claim** will be reduced by 50% or $20,000, whichever is less.

**C. Multiple Insureds, Claims, And Claimants**

The inclusion herein of more than one **Insured** in any **Claim** or the making of **Claims** by more than one person or organization will not operate to increase the Limits Of Liability stated in the Declarations. More than one **Claim** arising out of a single **Wrongful Act** or **Personal Injury** or a series of related **Wrongful Acts** or **Personal Injuries** will be considered a single **Claim**. All such **Claims**, whenever made, will be treated as a single **Claim**. Such single **Claim** will be deemed first made on the date on which the earliest **Claim** arising out of such **Wrongful Act, Personal Injury**, or **Interrelated Wrongful Acts** is made or with respect to written notice given to and accepted by the Company pursuant to Paragraph **A.** Claim Reporting Provision under Section **VIII** – Claims on the date within the **Policy Period** on which such notice of potential **Claim** is first received by the Company.

## SECTION VII – DEFENSE, SETTLEMENTS, AND CLAIM EXPENSES

**A. Defense, Investigation, And Settlement Of Claims**

The Company will have the right and duty to defend and investigate any **Claim** to which coverage under this policy applies pursuant to the following provisions:

    **1.** Any **Claim Expenses** incurred in investigating or defending such **Claim** shall be a part of, and not in addition to, the Limits Of Liability stated in the Declarations. Such **Claim Expenses** will reduce the limits of liability and will be

applied against the Deductible stated in the Declarations. The Company will have no obligation to pay any **Damages** or to defend or continue to defend any **Claim** or to pay **Claim Expenses** after the Limits Of Liability stated in the Declarations have been tendered to the **Insured** or into the court or exhausted by payments of **Damages** or **Claim Expenses**.

**2.** The Company will select defense counsel. However, if the law of the state of the **Insured's** domicile (as stated in the Declarations) allows the **Insured** to control the selection of defense counsel where a conflict of interest has arisen between the **Insured** and the Company, the Company will provide a list of attorneys or law firms from which the **Insured** may designate defense counsel who will act solely in the interest of the **Insured**, and the **Insured** will direct such defense counsel to cooperate with the Company. Such cooperation shall include:

   **a.** Providing to the Company on a regular basis, but not less frequently than every 3 months, written reports on claimed **Damages**, potential liability, progress of any litigation, or any investigation developments that materially affect the **Claim**;

   **b.** Providing to the Company immediately upon receipt any settlement demands or scheduled **Mediation**;

   **c.** Providing to the Company any other reasonable information requested and a fully itemized billing on a periodic basis; and

   **d.** Cooperating with the Company and the **Insured** in resolving any disputes including, but not limited to, billing disputes.

The fees and costs incurred by such defense counsel as set forth above, including those fees and costs generated by cooperation with the Company, will be included in **Claim Expenses**. Such **Claim Expenses** will be a part of, not in addition to, the Limits Of Liability stated in the Declarations. Such **Claim Expenses** will reduce the limits of liability and will be applied against the Deductible stated in the Declarations.

**B. Consent To Settlements**

**1.** The Company will not settle any **Claim** without the prior written consent of the **Insured**, but the Company will have, at all times, the right to recommend any settlement of any **Claim**. If the **Insured** refuses to settle such **Claim** pursuant to the Company's recommendations, then the Company's liability in regard to such **Claim** will not exceed the amount for which the **Claim** could have been settled and the amount of any **Claim Expenses** incurred up to the date of the **Insured's** refusal to settle the **Claim**. Such amounts are subject to the provisions of Paragraphs **A.** and **B.** under Section **VI** – Limits Of Liability, Deductibles, Multiple Claims, And Related Claims.

**2.** The **Insured** will not, with respect to any **Claim** covered under this policy, except at his or her own cost, make any payment, admit any liability, settle any **Claims**, assume any obligation, agree to arbitration or any similar means of resolution of any dispute, waive any rights, or incur **Claim Expenses** without the Company's prior written consent, such consent not to be unreasonably withheld. Any costs and expenses incurred by the **Insured** prior to the **Insured** giving written notice of the **Claim** to the Company will be borne by the **Insured** and will not constitute satisfaction of the deductible.

**SECTION VIII – CLAIMS**

**A. Claim Reporting Provision**

**1.** The **Insured** shall give to the Company written notice as soon as practicable of any **Claim** first made against the **Insured** during the **Policy Period** or the Extended Reporting Period, if applicable, but in no event later than:

   **a.** 60 days after expiration of the **Policy Period**; or

   **b.** The expiration of the Extended Reporting Period, if applicable.

Such **Claim** must be reported to the address stated in the claim reporting policyholder notice attached to this policy.

**2.** Subject to Paragraph **1.** above, in the event suit is brought or arbitration is instituted against the **Insured**, the **Insured** will immediately forward to the address stated in the claim reporting policyholder notice attached to this policy, every demand, notice, summons, or other process received by the **Insured** or by the **Insured's** representatives.

**B. Discovery Clause**

If, during the **Policy Period**, the **Insured** first becomes aware of a specific **Wrongful Act** or **Personal Injury** which is reasonably expected to result in a **Claim** within the scope of coverage of this policy, then the **Insured** may elect to provide notice of a potential **Claim** to the Company. Such notice to the Company shall be in writing, containing the

information listed below, and sent to the Company at the address stated on the claim reporting policyholder notice. If such written notice is received by the Company during the **Policy Period**, then any **Claim** subsequently made against the **Insured** arising out of such **Wrongful Act** or **Personal Injury** will be deemed for the purpose of this insurance to have been first made on the date on which such written notice is first received by the Company.

It is a condition precedent to the coverage afforded by this Discovery Clause that written notice shall be given to the Company containing the following information:

1. The description of the specific **Wrongful Act** or **Personal Injury**;

2. The date on which such **Wrongful Act** or **Personal Injury** took place;

3. The injury or damage which has or may result from such **Wrongful Act** or **Personal Injury**;

4. The identity of any persons or organization subject to such injury or damage; and

5. The circumstances by which the **Insured** first became aware of such **Wrongful Act** or **Personal Injury**.

**C.   Assistance And Cooperation Of The Insured**

The **Insured** will cooperate with the Company and, upon the Company's request, the **Insured** will:

1. Provide the Company with all information and assistance that the Company reasonably requests;

2. Submit to examination and interview by a representative of the Company, under oath if required;

3. Attend hearings, depositions, arbitrations, **Mediations**, and trials;

4. Assist in effecting settlement, securing and giving evidence, and obtaining the attendance of witnesses in the conduct of suits; and

5. Give a written statement or statements to the Company's representatives and meet with such representatives for the purpose of determining coverage and investigating or defending any **Claim**; all without cost to the Company other than expense reimbursement provided in Paragraph **B.** Supplementary Payments under Section **II** – Insuring Agreement.

The **Insured** will further cooperate with the Company and do whatever is necessary to secure and affect any right of indemnity, contribution, or apportionment which the **Insured** may have.

**D.   False Or Fraudulent Claims**

If any **Insured** commits fraud in proffering any **Claim**, this insurance shall become void from the date such fraudulent **Claim** is proffered.

**SECTION IX – EXTENDED REPORTING PERIOD**

**A.** If the Named Insured or Company nonrenews this policy or cancels this policy pursuant to Section **XI** – Other Conditions, **A.** Cancellation for reasons other than nonpayment of premium or deductible or non-compliance with the terms and conditions of this policy, then the Named Insured will have the right, upon payment of the applicable additional premium calculated at the Additional Premium Percentage stated in the Declarations, to extend the coverage granted under this Policy for the respective Additional Period stated in the Declarations immediately following the effective date of such cancellation or nonrenewal, but such extension of coverage shall only apply to **Claims** first made against the **Insureds** during such Additional Period for any **Wrongful Act** or **Personal Injury** committed on or after the **Retroactive Date** and prior to the effective date of such cancellation or nonrenewal. This Additional Period elected by the Named Insured and described in this paragraph will be referred to in this policy as the Extended Reporting Period.

If, however, this policy is immediately succeeded by similar claims made insurance coverage on which the retroactive date is the same as or earlier than that stated in the Declarations, the succeeding insurance will be deemed to be a renewal hereof and, in consequence, the Named Insured will have no right to purchase an Extended Reporting Period.

The quotation of a different premium, deductible, or limit of liability for renewal does not constitute a cancellation or refusal to renew for the purpose of this provision.

**B.** As a condition precedent to the right to purchase the Extended Reporting Period, the Named Insured must have paid:

1. All deductibles when due;

2. All premiums due for the **Policy Period**; and

**MELA 0001 05 21**                                                                                                                                        **Page 8 of 11**

3.  All premium and deductibles due on any other policies issued by the Company or any of its affiliated companies in an uninterrupted series of policies for which this policy is a renewal or replacement.

The right to purchase the Extended Reporting Period will terminate unless a written request for the Extended Reporting Period is received by the Company within 30 days after the effective date of cancellation or nonrenewal together with full payment for the Extended Reporting Period. If such written request and premium payment for the Extended Reporting Period are not so received by the Company, there shall be no right to purchase the Extended Reporting Period at a later date.

**C.**  In the event of the purchase of the Extended Reporting Period, the entire premium will be fully earned at its commencement.

**D.**  The Extended Reporting Period will not in any way increase the Limits Of Liability stated in the Declarations.

## SECTION X – NON-PRACTICING EXTENDED REPORTING PERIOD OPTIONS

**A.**  Any person who is a partner, officer, director, principal, shareholder, shareholder of a partner, member, or employee of the Named Insured who, during the **Policy Period**, retires or otherwise ceases, except by suicide, the private practice of their profession as a lawyer will have the right, upon payment of the applicable additional premium calculated at the Additional Premium Percentage stated in the Declarations, to extend the coverage granted under this policy for the respective Additional Period stated in the Declarations immediately following the effective date of such retirement or cessation of private practice, but such extension of coverage shall only apply to **Claims** first made against such **Insured** during such Additional Period for any **Wrongful Act** or **Personal Injury** committed on or after the **Retroactive Date** and prior to the effective date of such retirement or cessation of private practice. This Additional Period elected by the **Insured** and described in this paragraph will be referred to in this policy as the Non-Practicing Extended Reporting Period.

This Non-Practicing Extended Reporting Period Option will not be available when the license to practice law of the **Insured** exercising the Non-Practicing Reporting Period Option has been revoked, suspended, or surrendered at the request of any disciplinary or regulatory authority for any reason other than the retirement or cessation of private practice of such **Insured** at, on, or prior to the effective date of retirement or cessation of private practice.

**B.**  As a condition precedent to the right to elect the Non-Practicing Extended Reporting Period, the Named Insured must have paid:

1.  All deductibles when due;

2.  All premiums due for the **Policy Period**; and

3.  All premium and deductibles due on any other policies issued by the Company or any of its affiliated companies in an uninterrupted series of policies for which this policy is a renewal or replacement.

The right to elect the Non-Practicing Extended Reporting Period will terminate unless a written request for the Non-Practicing Extended Reporting Period is received by the Company within 60 days after the effective date of retirement or cessation of private practice together with full payment for the Non-Practicing Extended Reporting Period. If such written request and fully earned premium payment for the Non-Practicing Extended Reporting Period are not so received by the Company, there shall be no right to purchase the Non-Practicing Extended Reporting Period at a later date.

**C.**  In the event of the purchase of the Non-Practicing Extended Reporting Period, the entire premium therefor will be fully earned at its commencement.

**D.**  The Non-Practicing Extended Reporting Period will not in any way increase the Limits Of Liability stated in the Declarations.

## SECTION XI – OTHER CONDITIONS

**A. Cancellation**

1.  This Policy may be cancelled by the Named Insured on behalf of all **Insureds** by mailing to the Company written notice stating when thereafter such cancellation shall be effective. If cancelled by the Named Insured, the earned premium will be computed at the customary short rate. Payment or tender of unearned premium will not be a condition precedent to the effectiveness of cancellation, but such payment will be made as soon as practicable.

2.  This policy may be cancelled by the Company by mailing to the Named Insured, at the address stated in the Declarations, written notice stating when, not less than 30 days thereafter, such cancellation shall be effective. However, if the Company cancels this policy because the Named Insured has failed to pay a premium or

deductible when due, including premium and deductibles due on any other policies issued by the Company or any of its affiliated companies in an uninterrupted series of policies for which this policy is a renewal or replacement, this policy may be cancelled by the Company by mailing a written notice of cancellation to the Named Insured stating when, not less than 10 days thereafter, such cancellation will be effective. The mailing of notice as aforementioned shall be sufficient notice and the effective date of cancellation stated in the notice will become the end of the **Policy Period**. Such notice will be conclusive on all **Insureds**. Delivery of such written notice by the Named Insured or the Company will be equivalent to mailing. If cancelled by the Company, earned premium will be computed pro rata. Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter.

**B. Change In Risk**

If there is a change of more than 50% or 10 lawyers, whichever is less, at the Named Insured after the inception date of this policy, the Named Insured shall give written notice of such change to the Company as soon as practicable, but in no event later than 60 days after such change, and the Company will have the right to additional premium for such changes, based on its sole assessment of the additional exposures presented.

There will not be any premium adjustment during the **Policy Period** as the result of a change in the total number of lawyers at the Named Insured other than as stated herein above.

**C. Change In Ownership**

If, after the inception date of this policy:

**1.** Another entity, person, or group of entities or persons acting in concert acquires a majority of the voting securities of the Named Insured or majority successor in interest of the Named Insured;

**2.** The Named Insured is merged into or consolidated with another entity such that the Named Insured is not the surviving entity; or

**3.** A receiver, liquidator, conservator, trustee, or similar official is appointed with respect to the Named Insured;

then this policy will remain in effect until the end of the **Policy Period**, but only with respect to any **Wrongful Act** or **Personal Injury** which occurred before such change in ownership. The Named Insured shall give written notice of such change in ownership to the Company as soon as practicable, but in no event later than 60 days after such change in ownership. Further, in consideration of the coverage extended, the entire premium for this policy will be considered fully earned upon the occurrence of any of the above events.

**D. Representations**

By acceptance of this policy, the **Insureds** agree that the information and statements contained in the application(s) are:

**1.** The basis of this policy and are to be considered as incorporated into and constituting a part of this policy;

**2.** Their representations; and

**3.** Deemed material to the acceptance of the risk or hazard assumed by the Company under this policy; and

that this policy is issued in reliance upon the truth and accuracy of such representations.

**E. Entire Agreement**

This policy, the Declarations, the application(s), and any written endorsements attached hereto will be deemed to be a single, unitary contract.

**F. Other Insurance**

This insurance is excess of the Deductible stated in the Declarations and any other insurance available to the **Insured**, whether such other insurance is stated to be primary, contributory, excess, contingent, or otherwise, unless such other insurance is written only as a specific excess insurance over the limits of liability provided in this policy.

**G. Changes**

Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Company will not affect a waiver or a change in any part of this policy and will not estop the Company from asserting any right under the terms of this policy. The terms of this policy will not be waived or changed, except by written endorsement issued to form a part of this policy, and this policy embodies all agreements existing between the **Insureds** and the Company or any of its agents relating to this insurance.

**H. Assignment Of Interest**

Assignment of interest under this policy will not bind the Company unless its consent is endorsed hereon.

**I. Subrogation**

**1.** In the event of any payment under this policy, the Company will be subrogated to the right of recovery of all **Insureds** to the extent of such payment. The **Insured** will execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The **Insured** will do nothing after the **Claim** to prejudice such rights.

**2.** Any amount so recovered will be apportioned as follows:

Any recovery will first be used for the repayment of expenses incurred toward subrogation; second, to any **Damages** and **Claim Expenses** by the **Insured** in excess of any deductible; third, to any damages and claim expenses by an excess carrier on behalf of the **Insured**; fourth, to any damages and claim expenses by any primary carrier on behalf of the **Insured**; and, last, to repayment of the **Insured's** deductible.

**J. Action Against The Company**

**1.** No action will lie against the Company unless, as a condition precedent thereto, the **Insured** has fully complied with all of the terms and conditions of this policy, nor until the amount of the **Insured's** obligation to pay has been fully and finally determined either by judgment against the **Insured** after actual trial or by written agreement of the **Insured**, the claimant, and the Company.

**2.** Nothing contained in this policy will give any person or organization any right to join the Company as a co-defendant in any action against the **Insured** to determine the **Insured's** liability. Bankruptcy or insolvency of the **Insured** or of the **Insured's** estate will not relieve the Company of any of its obligations hereunder.

**K. Authorization**

By acceptance of this policy, all **Insureds** agree that the Named Insured stated in the Declarations will act on behalf of all **Insureds** with respect to the:

**1.** Giving and receiving of all notices to and from the Company as provided herein;

**2.** Exercising of the Extended Reporting Period;

**3.** Cancellation of this policy in whole or part;

**4.** Payment of premiums and deductibles when due; and

**5.** Receiving of any return premiums that may become due under this policy.

**L. Spousal And Domestic Partner Coverage**

If a **Claim** made against an **Insured** individual includes a **Claim** against that **Insured** individual's lawful spouse solely by reason of:

**1.** Such spouse's status as the **Insured** individual's spouse; and

**2.** Such spouse's ownership interest in property from which the claimant seeks recovery for the **Insured** individual's **Wrongful Acts**;

all loss which such spouse becomes legally obligated to pay on account of such **Claim** will be treated for purposes of this policy as **Damages** which the **Insured** individual is legally obligated to pay on account of the **Claim** made against the **Insured** individual. Such **Damages** will be covered under this policy only if and to the extent that such **Damages** would be covered under this policy if incurred by the **Insured** individual. Spousal And Domestic Partner Coverage does not apply to any **Claim** alleging any **Wrongful Act** by the **Insured** individual's spouse. The term spouse as used in this section includes any natural person qualifying as a domestic partner under the provisions of any applicable federal, state, or local law in the United States of America.

**M. Liberalization**

If the Company adopts any revision to this policy wording that would broaden the coverage under this policy at any time during the **Policy Period**, the broadened coverage will immediately apply to this policy, without any effect on the terms and conditions including, but not limited to, the limits of liability.



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SERVICE OF SUIT

Except with respect to any policy issued in any state in which the Insurer is licensed as an admitted insurer to transact business, it is agreed that in the event of the failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the Named Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court. Nothing in this clause constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Secretary, Legal Department, Markel Service, Incorporated, 10275 West Higgins Road, Suite 750, Rosemont, Illinois 60018, and that in any suit instituted against the Company upon this policy, the Company will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner or Director of Insurance or other official specified for that purpose in the statute, or his/her successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured or any beneficiary hereunder arising out of this policy, and hereby designates the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

**MEIL 1200 02 20**                                                                                          **Page 1 of 1**



# Evanston Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (BROAD FORM)

It is agreed that:

**1.**   This policy does not apply:

**A.**   Under any Liability Coverage, to bodily injury or property damage

   **(1)**   with respect to which an Insured under this policy is also an Insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an Insured under any such policy but for its termination upon exhaustion of its limit of liability; or

   **(2)**   resulting from the hazardous properties of nuclear material and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the Insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**B.**   Under any Medical Payments Coverage, or any Supplementary Payments provision relating to first aid, to expenses incurred with respect to bodily injury resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

**C.**   Under any Liability Coverage, to bodily injury or property damage resulting from the hazardous properties of nuclear material, if

   **(1)**   the nuclear material (a) is at any nuclear facility owned by, or operated by or on behalf of, an Insured or (b) has been discharged or dispersed therefrom;

   **(2)**   the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an Insured; or

   **(3)**   the bodily injury or property damage arises out of the furnishing by an Insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to property damage to such nuclear facility and any property thereat.

**2.**     As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or by-product material;

"source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility within the definition of nuclear facility under paragraph (a) or (b) thereof;

"nuclear facility" means

(a)     any nuclear reactor,

(b)     any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c)     any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the Insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235.

(d)     any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste.

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"property damage" includes all forms of radioactive contamination of property.

All other provisions of the policy shall remain unchanged.



PROFESSIONAL LIABILITY

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## 25% MINIMUM EARNED PREMIUM

This endorsement modifies insurance provided under the following:

LAWYERS PROFESSIONAL LIABILITY INSURANCE

In consideration of the premium paid, it is hereby understood and agreed that the following is added to Paragraph **A.** Cancellation of Section **XI** – Other Conditions:

In the event that this policy is cancelled by the Named Insured, the policy premium is subject to a minimum earned premium of 25% of the total premium.

All other terms and conditions remain unchanged.

**MELA 2201 04 17**                                                                                       **Page 1 of 1**

**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLV5PLA000546

# MARKEL®

## EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## MUTUAL CHOICE OF DEFENSE COUNSEL

This endorsement modifies insurance provided under the following:

LAWYERS PROFESSIONAL LIABILITY INSURANCE

In consideration of the premium paid, it is hereby understood and agreed that Paragraph **A.1.b.** of Section **VII – Defense, Settlements And Claims Expenses** is replaced with the following:

**A. Defense, Investigation And Settlement Of Claims**

  **1.** The Company will have the right and duty to defend and investigate any **Claim** to which coverage under this policy applies pursuant to the following provisions:

   **b.** The Company and the Named Insured will jointly select defense counsel with meaningful experience in the defense of Lawyers Professional Liability claims provided:

    **(1)** Such counsel will adhere to the company's file handling and billing guidelines applicable to the Company's current Claims Legal Vendor Guidelines; and

    **(2)** Such counsel will agree to submit billing through the Company's current electronic billing system.

   However, that if the law of the state of the **Insured's** domicile (as shown in the Declarations) allows the **Insured** to control the selection of defense counsel where a conflict of interest has arisen between the **Insured** and the Company, the Company will provide a list of attorneys or law firms from which the **Insured** may designate defense counsel who will act solely in the interest of the **Insured**, and the **Insured** will direct such defense counsel to cooperate with the Company. Such cooperation will include:

    **(1)** Providing on a regular basis, but not less frequently than every 3 months, written reports on claimed **Damages**, potential liability, progress of any litigation, any settlement demands, or any investigation developments that materially affect the **Claim**;

    **(2)** Providing any other reasonable information requested and a fully itemized billing on a periodic basis; and

    **(3)** Cooperating with the Company and the **Insured** in resolving any discrepancies.

   The fees and costs incurred by such defense counsel as set forth above, including those fees and costs generated by cooperation with the Company will be included in **Claim Expenses**. Such **Claim Expenses** will be a part of and will not be in addition to the Limits of Liability as shown in the Declarations. Such **Claim Expenses** will reduce the Limits of Liability and will be applied against the Deductible.

All other terms and conditions remain unchanged.

**MELA 2209 04 17**                                                                                                    **Page 1 of 1**



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SUBPOENA ASSISTANCE

This endorsement modifies insurance provided under the following:

LAWYERS PROFESSIONAL LIABILITY INSURANCE

### SCHEDULE

| Subpoena Limit: | $25,000 |
| --- | --- |

In consideration of the premium paid, it is hereby understood and agreed that the following is added to Paragraph **B.** Supplementary Payments of Section **II** – Insuring Agreement:

**Subpoena Assistance**

In the event that during the **Policy Period**, the **Insured** first receives a subpoena for **Insured's** documents or testimony related to the performance of **Professional Legal Services** which is not reasonably expected to result in a **Claim** against the **Insured**, the **Insured** will provide a copy of the subpoena or document request, if legal advice in response to the subpoena is requested. If requested, the Company may retain legal counsel to advise the **Insured** regarding document production, or to represent the **Insured** in giving sworn testimony. Legal fees and legal expenses incurred in providing advice as to production of documents, review of testimony and representation on the date of deposition will be at the Company's cost. In no event will notice of a **Claim** be eligible for coverage under this provision. The total of any payments for legal fees and legal expenses incurred will not exceed the Subpoena Limit shown in the Schedule of this endorsement for all subpoena(s) first received during the **Policy Period**.

All other terms and conditions remain unchanged.

MELA 2211 04 17                                                                                                      Page 1 of 1



**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLV5PLA000546

# EVANSTON INSURANCE COMPANY

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CRISIS MANAGEMENT EXPENSES

This endorsement modifies insurance provided under the following:

LAWYERS PROFESSIONAL LIABILITY INSURANCE

### SCHEDULE

| | |
|---|---|
| Limit Of Liability: | $25,000 |
| Specific Event: | Per Event |

In consideration of the premium paid, it is hereby understood and agreed that:

**A.** The following is added to Paragraph **B.** Supplementary Payments under Section **II – Insuring Agreement:**

**Crisis Management Expenses**

The Company shall reimburse **Crisis Management Expenses**, up to the Limit Of Liability shown in the Schedule of this endorsement, as the direct result of an **Incident** giving rise to a **Crisis** that occurs during the **Policy Period**.

No coverage for **Crisis Management Expenses** is provided by this policy except as provided by this endorsement. Regardless of the number of announcements, injured persons, or **Incidents**, the Limit Of Liability shown in the Schedule of this endorsement is the maximum liability of the Company.

Reimbursement of **Crisis Management Expenses** shall be in addition to the Limits Of Liability stated in the Declarations, and such payments will not be subject to the Deductible.

**B.** With respect only to coverage provided by this endorsement, Section **III – Definitions** is amended as follows:

**1.** Definitions **D.** Claim Expenses and **E.** Damages are amended to include the following:

**D.** **Claim Expenses** shall not include **Crisis Management Expenses**.

**E.** **Damages** shall not include **Crisis Management Expenses**.

**2.** The following definitions are added:

**Crisis** means the public announcement that an **Incident** occurred on an **Insured's** premises or at an event sponsored by an **Insured**.

**Crisis Management Expenses** means those expenses that have been approved by the Company prior to being incurred by the **Insured** for services provided by a **Crisis Management Firm**.

However, **Crisis Management Expenses** shall not include compensation, fees, benefits, overhead, charges, or expenses of any **Insured** or any employees of any **Insured**, nor any expenses that are payable on behalf of any **Insured** or reimbursable to any **Insured** under any other valid and collectible insurance.

**Crisis Management Firm** means any crisis management service provider hired by an **Insured** and approved by the Company.

**Incident** means:

1. The death, incapacity, or criminal indictment of any director, trustee, or officer including, but not limited to, the executive director or any employee on whom the Named Insured maintains key person life insurance;

2. The public announcement that the Named Insured intends to file for bankruptcy protection or that a third party is seeking to file for involuntary bankruptcy on behalf of the Named Insured; or the imminence of bankruptcy proceedings of the Named Insured, whether voluntary or involuntary;

3. The public announcement of the withdrawal or return of any non-governmental grant, contribution, or bequest in excess of $500,000;

4. The public announcement of the commencement or threat of commencement of litigation or governmental, regulatory, or criminal proceedings against the Named Insured;

5. The public announcement or accusation that the Named Insured, in the scope of insured operations, has caused the **Bodily Injury** of one or more persons or **Property Damage** to any tangible group of properties; or

6. Any other Specific Event shown in the Schedule of this endorsement.

However, **Incident** shall not include any event in any way involving:

a. Any **Claim** which has been reported, or any circumstances of which notice has been given, under any policy of which this Policy is a renewal or replacement, whether or not such policy affords coverage for such **Incident**; or

b. The hazardous properties of nuclear materials.

All other terms and conditions remain unchanged.



**PROFESSIONAL LIABILITY**

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMENDED NOTARY EXCLUSION

This endorsement modifies insurance provided under the following:

LAWYERS PROFESSIONAL LIABILITY INSURANCE

Exclusion **A.7.** under Section **IV** – Exclusions is replaced by the following:

This policy does not apply to any **Claim**:

**A.**    Based upon, arising out of, or in any way involving any:

Notarized certification or acknowledgement by any **Insured**, in their capacity as a notary public, of a signature without the physical appearance at the time of said notarization before such notary public, or the person who is or claims to be the person signing such instrument; however, this exclusion shall not apply to notarial acts performed by an **Insured** in compliance with applicable state law(s), administrative rule(s) and/or regulation(s) allowing commissioned notaries public to perform notarial acts electronically. For those states with no applicable law(s), administrative rule(s) and/or regulation(s), this exclusion shall not apply to notarial acts performed by an Insured in compliance with the National Electronic Notarization Standard as established and adopted by the National Association of Secretaries of States.

All other terms and conditions remain unchanged.



**PROFESSIONAL LIABILITY**
POLICY NUMBER: MKLV5PLA000546

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT OF EACH CLAIM AND AGGREGATE LIMITS AND DEDUCTIBLES WITH SPLIT RETROACTIVE DATES

This endorsement modifies insurance provided under the following:

LAWYERS PROFESSIONAL LIABILITY INSURANCE

### SCHEDULE

| Retroactive Date | Limits Of Liability | Deductible |
|---|---|---|
| 08/27/2003 | $2,000,000 Each Claim | $50,000 Each Claim |
| | $2,000,000 Policy Aggregate | $100,000 Policy Aggregate |

In consideration of the premium paid, it is hereby understood and agreed that the following is added to Section **VI** – Limits Of Liability, Deductibles, Multiple Claims, And Related Claims:

With respect to **Claims** by reason of a **Wrongful Act** or **Personal Injury** that occurs on or after the Retroactive Date(s) shown in the Schedule of this endorsement, the only limit available for such **Claims** is the Limits Of Liability shown in the Schedule of this endorsement for the applicable Retroactive Date. Such **Claims** will be subject to the Deductibles shown in the Schedule of this endorsement for the applicable Retroactive Date.

All other terms and conditions remain unchanged.

**MELA 2233 05 21**                                                                                                                        **Page 1 of 1**



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AGGREGATE DEDUCTIBLE

This endorsement modifies insurance provided under the following:

LAWYERS PROFESSIONAL LIABILITY INSURANCE

### SCHEDULE

| Aggregate Deductible | $100,000 |
|---|---|

The following is added to Paragraph **B.** Deductibles under Section **VI** – Limits Of Liability, Deductibles, Multiple Claims, And Related Claims:

**Aggregate Deductible**

The total deductible payments to be paid by the Named Insured will not exceed the Aggregate Deductible shown in the Schedule of this endorsement for **Damages** and **Claim Expenses** arising out of all **Claims**, other than any Supplementary Payments, first made during the **Policy Period** and the Extended Reporting Period, if applicable.

All other terms and conditions remain unchanged.



PROFESSIONAL LIABILITY

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – OFFICE SHARING

This endorsement modifies insurance provided under the following:

LAWYERS PROFESSIONAL LIABILITY INSURANCE

In consideration of the premium paid, it is hereby understood and agreed that the following is added to Paragraph **A.** of Section **IV** – Exclusions:

This policy does not apply to any **Claim**:

**A.** Based upon, arising out of, or in any way involving any:

Lawyer sharing common or adjacent office facilities, offices, office space or staff that is not a partner, associate, **Of Counsel**, or a **Temporary Or Leased Professional**, for the Named Insured.

All other terms and conditions remain unchanged.



**PROFESSIONAL LIABILITY**

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – SPECIFIED INCIDENT, CLAIM OR SUIT

This endorsement modifies insurance provided under the following:

LAWYERS PROFESSIONAL LIABILITY INSURANCE

In consideration of the premium paid, it is hereby understood and agreed that the following is added to Paragraph **A.** of Section **IV** – Exclusions:

This policy does not apply to any **Claim:**

**A.** Based upon, arising out of, or in any way involving any:

    **Wrongful Act** or **Personal Injury**, or any fact, circumstance, situation, incident, **Claim** or suit referred to in an answer to any question of the application(s) or addendum(a) attached to this policy or, if this policy is a renewal or replacement of any policy issued by the Company or any of its affiliated companies, the application(s) or addendum(a) attached to the initial policy.

All other terms and conditions remain unchanged.



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# POLICY CHANGES

This endorsement forms a part of the policy numbered below:          Policy Change Number: A

| POLICY NUMBER | POLICY CHANGES EFFECTIVE | COMPANY |
|---|---|---|
| MKLV5PLA000546 | 10/31/2022 | Evanston Insurance Company |

| NAMED INSURED | AUTHORIZED REPRESENTATIVE |
|---|---|
| Harris Bricken Sliwoski, LLP | CRC Insurance Services, Inc.<br>50 California Street, Suite 2000<br>San Francisco, CA 94111 |

| COVERAGE PARTS AFFECTED |
|---|
| Lawyers Professional Liability Insurance Coverage Part |

| CHANGES |
|---|

**AMENDMENT OF TERRITORY**

In consideration of the premium paid, it is hereby understood and agreed that:

A. Section V – Territory is replaced with the following:
The insurance afforded by this policy applies worldwide, except for any country on which the government of the United States Of America has imposed trade sanctions, embargoes or any similar regulations that prohibit the transaction of business with or within such country.

B. The following is added to Paragraph A. Defense, Investigation And Settlement of Claims of Section VII – Defense, Settlements And Claim Expenses:
Any payments shall be made in U.S. currency from bank or financial institution located in the United States of America. With respect to Claims brought in a country other than the United States of America, payment will be made to the Named Insured.

All other terms and conditions remain unchanged.

| ☒ NO CHANGES | ☐ TO BE ADJUSTED AT AUDIT | ADDITIONAL PREMIUM $ | RETURN PREMIUM $ |
|---|---|---|---|

_____
Authorized Representative Signature



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# POLICY CHANGES

This endorsement forms a part of the policy numbered below:          Policy Change Number: B

| POLICY NUMBER | POLICY CHANGES EFFECTIVE | COMPANY |
|---|---|---|
| MKLV5PLA000546 | 10/31/2022 | Evanston Insurance Company |

| NAMED INSURED | AUTHORIZED REPRESENTATIVE |
|---|---|
| Harris Bricken Sliwoski, LLP | CRC Insurance Services, Inc.<br>50 California Street, Suite 2000<br>San Francisco, CA 94111 |

| COVERAGE PARTS AFFECTED |
|---|
| Lawyers Professional Liability Insurance |

| CHANGES |
|---|

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### AMENDMENT OF LIMITS OF LIABILITY – SPECIFIED LAWYER(S)

This endorsement modifies insurance provided under the following:

LAWYERS PROFESSIONAL LIABILITY INSURANCE

### SCHEDULE
Lawyer(s): Carlton J. Willey, Habib Bentaleb, Daniel E. Dersham
Each Claim:          $100,000
Policy Aggregate:      $300,000
Retroactive Date:      10/31/2013
Effective Date :       03/14/2019

1. Solely with respect to Claims based upon, arising out of or in any way involving
Professional Legal Services rendered in whole or in part by the Lawyer(s) shown in the
Schedule of this endorsement, the following is added to Paragraph A. Professional
Liability Coverage of Section II – Insuring Agreement:
The policy does not apply to any Claim arising out of a Wrongful Act or Personal Injury
first happening prior to the Retroactive Date shown in the Schedule of this endorsement.
The total liability of the Company for Claims arising out of any Wrongful Act or Personal
Injury first happening on or after the Retroactive Date shown in the Schedule of this
endorsement but before March 1, 2017 will not exceed the Each Claim and Policy Aggregate limits shown in
the Schedule of this endorsement.
The total liability of the Company for Claims arising out of any Wrongful Act or Personal Injury first happening
on or after March 1, 2017 but before October 31, 2018 will not exceed $2,000,000.
The total liability of the Company for Claims arising out of any Wrongful Act or Personal Injury first happening
on or after October 31, 2018 will not exceed $3,000,000.
For Claims based upon or arising out of a series of related Wrongful Acts or Personal Injuries, the total liability
of the Company will be determined by the date on which the first Wrongful Act or the first Personal Injury of the
series first happens.

2. Solely with respect to Claims based upon, arising out of or in any way involving Professional Legal Services rendered in whole or in part by the Lawyer(s) shown in the Schedule of this endorsement, Paragraph J., Section IV – Definitions is deleted and replaced with the following

All other terms and conditions remain unchanged.

| ☒ NO CHANGES | ☐ TO BE ADJUSTED AT AUDIT | ADDITIONAL PREMIUM $ | RETURN PREMIUM $ |
|---|---|---|---|

_____
Authorized Representative Signature



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## TRADE OR ECONOMIC SANCTIONS

The following is added to this policy:

**Trade Or Economic Sanctions**

This insurance does not provide any coverage, and we (the Company) shall not make payment of any claim or provide any benefit hereunder, to the extent that the provision of such coverage, payment of such claim or provision of such benefit would expose us (the Company) to a violation of any applicable trade or economic sanctions, laws or regulations, including but not limited to, those administered and enforced by the United States Treasury Department's Office of Foreign Assets Control (OFAC).

All other terms and conditions remain unchanged.



**PROFESSIONAL LIABILITY**

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – SOCIAL ENGINEERING INCIDENT

This endorsement modifies insurance provided under the following:

LAWYERS PROFESSIONAL LIABILITY INSURANCE

**A.**  The following definition is added to Section **III** - Definitions:

**Social Engineering Incident** means any priming, pre-texting, spoofing, or other fraudulent or deceptive communication sent to an **Insured** within the normal course of the Named Insured's business operations.

**B.**  The following replaces Exclusion **A.12.** under Section **IV** – Exclusions:

This policy does not apply to any **Claim**:

**A.**  Based upon, arising out of, or in any way involving any:

    **12. Unauthorized Access**, **Unintentional Data Compromise**, or **Social Engineering Incident**;

All other terms and conditions remain unchanged.



**Evanston Insurance Company**

**MARKEL**®

# DESIGNED PROTECTION℠ FOR LAW FIRMS
# APPLICATION FOR LAWYERS PROFESSIONAL LIABILITY INSURANCE

THE POLICY FOR WHICH APPLICATION IS MADE APPLIES ONLY TO CLAIMS FIRST MADE DURING THE POLICY PERIOD. CLAIM EXPENSES WILL REDUCE THE LIMITS OF LIABILITY AND WILL APPLY AGAINST THE DEDUCTIBLE. PLEASE READ THE POLICY CAREFULLY.

If space is insufficient to answer any question fully, attach a separate sheet.

| NAME OF APPLICANT: Harris Bricken Sliwoski, LLP dba Harris Bricken | Date: 8/1/2022 |
|---|---|
| Contact Name: Vincent Sliwoski | Phone: 206-224-5657 |

| Principal Address: 600 Stewart St, STE 1200 | | |
|---|---|---|
| City: Seattle | State: WA | Zip Code: 98101 |

| Secondary Practice Locations: Portland, OR; Los Angeles, CA; Salt Lake City, UT; Tempe, AZ; New York, NY | |
|---|---|
| Company Website: www.harrisbricken.com | Date Established: 8/2003 |
| Email Address: vince@harrisbricken.com, operations@harrisbricken.com | NAICS: |

Applicant is a(n):   ☐ Individual   ☒ Partnership   ☐ Corporation   ☐ Joint Venture   ☐ Other

_____
*(please describe)*

---

**General Information**

1. Is the applicant seeking coverage for a Predecessor Firm? A "Predecessor Firm" is any legal entity which was engaged in the practice of law to whose financial assets and liabilities the applicant is the majority successor in interest.   ☒ Yes ☐ No

   If yes, attach the MALA 1018 Supplemental Schedule Of Predecessor Firms.

2. a. Within the last 2 years has the applicant formed, acquired, or merged with any other law firm?   ☐ Yes ☒ No

   b. Are any other law firm formations, acquisitions, or mergers being contemplated?   ☐ Yes ☒ No

   If yes to a. or b., provide details on a separate sheet.

3. Provide the percentage of firm revenues by client type:

| Client Type | Percentage | Client Type | Percentage |
|---|---|---|---|
| Start-up Businesses | 25 | Governmental Entities | |
| Privately-held Companies | 35 | Individuals | 25 |
| Publicly-traded Companies | 15 | Other: | |
| | | TOTAL: | 100% |

**Financial And Staffing Information**

1. Provide the applicant's total annual gross revenues for the last 3 years. If newly formed, provide estimated annual gross revenues for the current year.

   $7.64mil_____ last 12 months        $9.94mil_____ 1st prior year        $9.98mil_____ 2nd   prior
          year

2. Does the applicant have:

   a. A full-time office administrator?                                               ☒ Yes ☐ No

   b. A Management/Executive Committee?                                               ☒ Yes ☐ No

      If yes,

      (1) How many members comprise such committee? 3_____

      (2) How often does such committee meet? weekly_____

   c. An Ethics Counsel?                                                             ☒ Yes ☐ No

3. Attach the MALA 1017 Supplemental Schedule Of Lawyers with the names of all lawyers and limited license legal technicians who are presently officers, partners, employed lawyers, Of Counsels, independent contractors, retired partners, or employed limited license legal technicians of the applicant and complete the information requested for each.

4. Provide the following for the applicant's staff:

| Lawyers And Staff | Number Currently Engaged | Number Who Left The Applicant Last Year |
|---|---|---|
| Lawyers | 21   (total from attached schedule) | 5 |
| Limited License Legal Technicians Or Equivalent | | |
| Paralegals | 4 | 2 |
| Other Non-Lawyer Employees | 4 FT; 5 PT | 2 |

5. In the last 2 years, has any lawyer served or does any lawyer proposed for this coverage currently serve as director, officer, trustee, or partner of or have fiduciary control over any outside entity?                    ☐ Yes ☒ No

   If yes, please complete MALA 1012 Supplement For Outside Interests.

6. In the last 2 years, has any lawyer proposed for this coverage held an equity or financial interest in a client or a client's property?                                                                                    ☐ Yes ☒ No

   If yes, please complete MALA 1012 Supplement For Outside Interests.

7. Is any lawyer proposed for this coverage:

   a. An employee of any organization, entity, or governmental body other than the applicant?          ☒ Yes ☐ No

   b. Engaged in any professional/business activities other than the private practice of law?           ☐ Yes ☒ No

   If yes to a. or b., provide details: Nadja Vietz is employed by firm in Spain_____
   _____

8. After inquiry, is the applicant aware that any person proposed for this insurance suffers from any impairment or condition, currently or in the prior 2 years, which might affect their competence to render Professional Legal Services?                                                                                           ☐ Yes ☒ No

   If yes, provide details on a separate sheet on what steps have been taken to mitigate the impact of the impairment or condition. It is not necessary to identify the individual.

**Practice Areas**

1.   Indicate percentage of time devoted to the following areas of practice:

| Area of Practice | Percentage | Area of Practice | Percentage |
|---|---|---|---|
| Administrative | 5 | Labor Relations | |
| Admiralty/Marine | |    Employees | |
| Antitrust/Trade Regulation | |    Management | |
| Appellate | | Plaintiff Work † | |
| Arbitration/Mediation | |    Civil Rights/Discrimination | |
| Bankruptcy | |    Class Action/Mass Tort | |
| Business/Commercial/Contracts Law | 20 |    PI/PD Litigation | |
| Cannabis | 20 |    Medical Malpractice | |
| Collections † | 5 |    Professional Liability | |
|    Commercial Debt/Credit | |    Social Security | |
|    Consumer Debt/Credit | |    Workers Compensation | |
| Communications/FCC | |    Other: | |
| Construction Law | | Defense Work † | |
| Corporate Law | |    Class Action/Mass Tort | |
|    Administrative/Record Keeping | 5 |    Insurance | |
|    Formation | 10 |    Other: | |
|    Mergers & Acquisitions | 5 | Real Estate † | |
|    Stock Options – Any Involvement | |    HOA/POA | |
|    Criminal Law | |    Residential Closings | |
| Cyber | |    Commercial Transactions | 5 |
| Elder Law/Social Security | |    Developments | |
| Energy/Natural Resources | |    Foreclosure/Repossession/Loan Workout | |
| Entertainment/Sports † | |    Syndication | |
| Environmental Law | |    Title Work † | |
| ERISA | | Securities | |
| Estate, Trust, Probate, Wills † | |    Litigation Law | |
|    Assets under $5 mil | |    Municipal Bonds | |
|    Assets over $5 mil | |    Private Stock Offerings | 2 |
| Family/Domestic | |    Public Stock Offerings | |
|    Divorce – Assets under $1 mil | |    Regulatory Compliance | |
|    Divorce – Assets over $1 mil | | Taxation | |
|    Other: | |    Tax Opinions | |
|    Financial Institutions /Banking † | |    Tax Return Preparation | |
| Government/Municipal | |    Tax Shelter Related Work | |
| Healthcare | | Traffic Law | |
| Immigration/Naturalization | | Tribal Law | |
| Intellectual Property † | | Utilities | |
|    Patent | | Water Law | |
|    Copyright/Trademark | 3 | Other: (Describe) | |

| Area of Practice | Percentage | Area of Practice | Percentage |
|---|---|---|---|
| International Law | 20 | TOTAL | 100% |

† *Complete a Supplemental Application for this Area of Practice - See Additional Information section for details.*

2. Has the applicant, or does the applicant intend to, provide representation or render advice directly related to the distribution, warehousing, growing, manufacturing, or selling of cannabis in states where not legally approved?   ☐ Yes ☒ No

**Business Practices**

1. a. Have any of the applicant's past or present clients become insolvent or bankrupt or gone into liquidation or receivership during the last 2 years?   ☒ Yes ☐ No

   b. Is the applicant aware of any client that is likely to become insolvent or bankrupt?   ☐ Yes ☒ No

   If yes to either a. or b., provide details including client name, client address, and description of legal services provided:

   Golf Tailor - 103 S Broadway, STE 210 Edmond OK 73034 - China corporate, trademark, and litigation (most of the work is 2019 or earlier)

2. a. Has the applicant filed any suit for collection of fees against any client in the last 2 years?   ☐ Yes ☒ No

   If yes,

   (1) How many? _____

   (2) Provide the following information for each suit for unpaid legal fees:

| Date Filed | Name Of Client | $ Amount Sought | Status/Result |
|---|---|---|---|
|  |  | $ |  |
|  |  | $ |  |
|  |  | $ |  |

   b. What steps have been taken by the applicant to reduce or avoid the necessity of fee collections suits in the future? We continue to update standard operating procedures for billing and collections. We created a billing committee to review outstanding invoices and collections, and to work with attorneys and clients to development payment plans or discounts, if necessary. We require getting formal written engagements for any requests for additional work, especially those that deviate away from the original scope or may lead to litigation.

3. When evaluating whether a case should be sent for collection, does the applicant review the file to evaluate the possibility of receiving a counterclaim alleging malpractice in response?   ☒ Yes ☐ No

4. Does the applicant accept cases where the cause of action arises and is adjudicated outside of the applicant's local jurisdiction (i.e., in another state)?   ☒ Yes ☐ No

   If yes, does the applicant refer such cases to local counsel?   ☒ Yes ☐ No

5. Has the applicant outsourced any legal work in the last 2 years?   ☒ Yes ☐ No

   If yes,

   a. Explain the nature of the outsourced work: employment legal advice as we do not have anyone who specializes in employment law; land use legal advice as we do not have a specialized attorney

b.  Is any legal work outsourced internationally?                                    ☒ Yes ☐ No

If yes, where? <u>international trademark assistance: Japan, China, Vietnam, Korea, Colombia, Costa Rica</u>

<u>formation documents: Colombia</u>

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

6.  Does the applicant have any single client or group of related clients which have produced more than 25% of total gross billings during the last 2 years?                                    ☐ Yes ☒ No

If yes, provide the percentage of gross billings, name of client, business activities of client, and services provided on behalf of the client: _____%

7.  In the last 2 years, has the applicant accepted client securities or other forms of compensation in lieu of fees?                                    ☐ Yes ☒ No

If yes, provide details: _____

8.  Does the applicant share office space, letterhead, or staff with any other law firm?                ☐ Yes ☒ No

If yes, provide details: _____

---

**Management And Administration**

1.  Have any measures been taken by the applicant to protect against possible claims made against the applicant arising from the acts, errors, or omissions committed by a lateral hire?                ☒ Yes ☐ No

If yes, provide details: _____

2.  a.  Does the applicant's docket control system include:

(1)  Computer system?                                    ☒ Yes ☐ No

(2)  Dual calendar?                                    ☒ Yes ☐ No

(3)  Immediate entry of all dates?                                    ☒ Yes ☐ No

(4)  Master listings?                                    ☒ Yes ☐ No

(5)  Provisions for illness of document administrator?                                    ☒ Yes ☐ No

(6)  Single calendar?                                    ☒ Yes ☐ No

(7)  Tickler system?                                    ☒ Yes ☐ No

(8) Verification of completion of events? ☒ Yes ☐ No

b. How frequently are deadlines cross-checked? ☐ Daily ☒ Weekly ☐ Monthly

c. Does the docket control system produce a daily or weekly calendar? ☒ Yes ☐ No

3. Does the applicant maintain a system to avoid potential conflicts of interest? ☒ Yes ☐ No

   a. If yes, check all that apply:

      ☒ Oral/Memory    ☒ Computer    ☐ Index File

   b. Indicate the items captured by the system:

      ☒ Client Name   ☒ Client's Principals   ☒ Client's Subsidiaries   ☒ Opposing Party  ☒ Opposing Counsel

      ☒ Related Individuals  ☒ Predecessor Firm Conflict Information   ☐ Other: _____

   c. Does the applicant have a conflict committee or conflict consultant? ☒ Yes ☐ No

      If no, how are potential conflicts resolved? _____

4. Provide the percentage of matters on which the applicant sends:

   a. An engagement letter when accepting a representation   <u>100</u>%

   b. A non-engagement letter when declining a representation   <u>0</u>%

   c. A disengagement letter when ceasing a representation   <u>100</u>%

5. Does the applicant have:

   a. A policy prohibiting its attorneys from participating as a partner, officer, or director in any entity other than the applicant when the applicant provides legal services? ☒ Yes ☐ No

      If no, please explain: _____

   b. A formal training program for lawyers joining the firm? ☒ Yes ☐ No

   c. Internal risk management audits performed on a regular basis? ☒ Yes ☐ No

   d. Annual audited financial statements produced each year? ☒ Yes ☐ No

6. Does the applicant have a formal procedure for and actively obtain second factor phone authorizations before releasing any wire transfer instructions? ☒ Yes ☐ No

   If no, please explain: _____

---

**Insurance And Claim History**

1. a. Indicate the Per Claim/Annual Aggregate limits of liability requested:

<b>Limits Of Liability</b>

     ☐ $1,000,000 / $1,000,000      ☒ $3,000,000 / $3,000,000

     ☐ $1,000,000 / $2,000,000      ☒ $4,000,000 / $4,000,000

     ☐ $2,000,000 / $2,000,000      ☒ $5,000,000 / $5,000,000

   b. Indicate the deductible requested:

     Deductible: ☐ $5,000  ☐ $7,500  ☐ $10,000  ☐ $15,000  ☒ $25,000  ☒ $50,000  ☐ Other $_____

   THE COMPANY DOES NOT GUARANTEE TO OFFER ANY OF THE ABOVE LIMITS OR DEDUCTIBLES.

2. List the Lawyers Professional Liability Insurance that has applied to the applicant for the last 2 years.

   If none, check here. ☐

| Insurance Company | Limits Of Liability | Deductible | Premium | Expiration Date MM/DD/YY | Retroactive/ Prior Acts Date* | Number Of Lawyers Covered |
|---|---|---|---|---|---|---|
| Evanston - Primary<br>Old Republic - Excess | $3,000,000/$3,000,000 Primary<br>$2,000,000/$2,000,000 Excess | $50,000 | $93,998.37 Primary<br>$41,800 Excess | 10/31/2022 | Split 08/27/2003 for $2,000,000 / $2,000,000 Limits<br>10/31/2018 for $3,000,000 / $3,000,000 Limit | 21 |
| Evanston | $3,000,000 / $3,000,000 | $50,000 | $68,600 | 10/31/2021 | Split 08/27/2003 for $2,000,000 / $2,000,000 Limits<br>10/31/2018 for $3,000,000 / $3,000,000 Limits | 21 |

*Attach a copy of the applicant's current insurance policy's prior acts endorsement or declarations which states the retroactive date.

3. Has any insurer canceled, nonrenewed, or declined to issue any Lawyers Professional Liability Insurance Policy or any similar insurance on behalf of any person(s) or entity(ies) proposed for this insurance?   ☒ Yes ☐ No

   If yes, provide details: Previous carrier (Fireman's '12-'13) declined renewal because it ceased covering international practices.

4. Has any lawyer associated with the firm, past or present, ever been refused admission to practice, been disbarred, subjected to any discipline, sanctioned, fined, or held in contempt by any court, state or local bar association, administrative agency, or regulatory body?   ☐ Yes ☒ No

   If yes, provide complete details on a separate sheet, including a copy of the court's final opinion.

5. Are any persons or entities proposed for this insurance currently under investigation, or has any disciplinary complaint or grievance been made to any court, bar association, administrative agency, or regulatory body?   ☐ Yes ☒ No

   If yes, provide details on a separate sheet.

6. Has any Professional Liability claim(s) been made against the applicant or any person or entity proposed for this insurance or any predecessor firm(s) in the last 5 years?   ☒ Yes ☐ No

   If yes, indicate total number of claims: 3

   Please complete MALA 1011 Designed Protection$^{SM}$ For Law Firms Supplemental Claim Information for each claim.

7. After inquiry, is any person or entity proposed for this insurance aware of any fact, act, error, omission, personal injury, incident, circumstance, or situation that could result in any claim under the proposed insurance, irrespective of the actual validity of the claim?   ☐ Yes ☒ No

   If yes, indicate total number: _____

   Has this information been reported to any insurer?   ☐ Yes ☐ No

Please complete MALA 1011 Designed Protection<sup>SM</sup> For Law Firms Supplemental Claim Information for each claim or claim circumstance.

**Additional Information**

As part of this application, attach a copy of the applicant's current letterhead for all offices, and completed MALA 1017 Supplemental Schedule Of Lawyers, MALA 1018 Supplemental Schedule Of Predecessor Firms, and the applicable Area Of Practice Supplements:

| Area Of Practice | Required Supplement | Area of Practice | Required Supplement |
|---|---|---|---|
| Class Action/Mass Tort | MALA 1007 Supplement For Class Action/Mass Tort | Intellectual Property | MALA 1003 Supplement For Intellectual Property Practice |
| Collections | MALA 1005 Supplement For Collections Practice | Plaintiff Work | MALA 1016 Supplement For Plaintiff Firms |
| Defense Work | MALA 1008 Supplement For Insurance Defense | Real Estate | MALA 1004 Supplement For Real Estate Practice |
| Entertainment/Sport | MALA 1002 Supplement For Entertainment / Sports / Media / Content Creation Practice | Securities | MALA 1015 Supplement For Securities |
| Estate, Trust, Probate, Wills | MALA 1013 Estate Practice Supplement | Taxation | MALA 1014 Supplement For Taxation |
| Financial Institutions/Banking | MALA 1006 Supplement For Financial Institutions Practice | Title | MALA 1001 Supplement For Wholly Owned Title Agency |

**Fraud Warnings**

**Applicable in AL, AR, DC, LA, MD, NM, RI and WV:** Any person who knowingly (or willfully)* presents a false or fraudulent claim for payment of a loss or benefit or knowingly (or willfully)* presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. *Applies in MD only.

**Applicable in CO:** It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**Applicable in FL and OK:** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony (of the third degree)*. *Applies in FL only.

**Applicable in KS:** Any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written, electronic, electronic impulse, facsimile, magnetic, oral, or telephonic communication or statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act.

**Applicable in KY, NY, OH and PA:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties (not to exceed five thousand dollars and the stated value of the claim for each such violation)*. *Applies in NY only.

**Applicable in ME, TN, VA and WA:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties (may)* include imprisonment, fines and denial of insurance benefits. *Applies in ME only.

**Applicable in MN:** A person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

**Applicable in NJ:** Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

**Applicable in OR:** Any person who knowingly and with intent to defraud or solicit another to defraud the insurer by submitting an application containing a false statement as to any material fact may be violating state law.

**Applicable in VT:** Any person who knowingly presents a false statement in an application for insurance may be guilty of a criminal offense and subject to penalties under state law.

**Applicable in all other states:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

---

**NOTICE TO THE APPLICANT - PLEASE READ CAREFULLY**

NO FACT, CIRCUMSTANCE, OR SITUATION INDICATING THE PROBABILITY OF A CLAIM OR ACTION FOR WHICH COVERAGE MAY BE AFFORDED BY THE PROPOSED INSURANCE IS NOW KNOWN BY ANY PERSON(S) OR ENTITY(IES) PROPOSED FOR THIS INSURANCE OTHER THAN THAT WHICH IS DISCLOSED IN THIS APPLICATION. IT IS AGREED BY ALL CONCERNED THAT IF THERE IS KNOWLEDGE OF ANY SUCH FACT, CIRCUMSTANCE, OR SITUATION, ANY CLAIM SUBSEQUENTLY EMANATING THEREFROM WILL BE EXCLUDED FROM COVERAGE UNDER THE PROPOSED INSURANCE.

FOR THE PURPOSE OF THIS APPLICATION, THE UNDERSIGNED AUTHORIZED AGENT OF THE PERSON(S) AND ENTITY(IES) PROPOSED FOR THIS INSURANCE DECLARES THAT TO THE BEST OF THEIR KNOWLEDGE AND BELIEF, AFTER REASONABLE INQUIRY, THE STATEMENTS IN THIS APPLICATION AND IN ANY ATTACHMENTS, ARE TRUE AND COMPLETE. THE COMPANY AND AFFILIATES THEREOF ARE AUTHORIZED TO MAKE ANY INQUIRY IN CONNECTION WITH THIS APPLICATION. SIGNING THIS APPLICATION DOES NOT BIND THE COMPANY TO PROVIDE OR THE APPLICANT TO PURCHASE THE INSURANCE.

THIS APPLICATION, INFORMATION SUBMITTED WITH THIS APPLICATION, AND ALL PREVIOUS APPLICATIONS AND MATERIAL CHANGES THERETO ARE CONSIDERED PHYSICALLY ATTACHED TO AND PART OF THE POLICY IF ISSUED. THE COMPANY WILL HAVE RELIED UPON THIS APPLICATION AND ALL SUCH ATTACHMENTS IN ISSUING THE POLICY.

IF THE INFORMATION IN THIS APPLICATION AND ANY ATTACHMENT MATERIALLY CHANGES BETWEEN THE DATE THIS APPLICATION IS SIGNED AND THE EFFECTIVE DATE OF THE POLICY, THE APPLICANT WILL PROMPTLY NOTIFY THE COMPANY, WHO MAY MODIFY OR WITHDRAW ANY OUTSTANDING QUOTATION OR AGREEMENT TO BIND COVERAGE.

THE UNDERSIGNED DECLARES THAT THE PERSON(S) AND ENTITY(IES) PROPOSED FOR THIS INSURANCE UNDERSTAND THAT:

(I)   THE POLICY FOR WHICH THIS APPLICATION IS MADE APPLIES ONLY TO CLAIMS FIRST MADE DURING THE POLICY PERIOD;

(II)  UNLESS AMENDED BY ENDORSEMENT, THE LIMITS OF LIABILITY CONTAINED IN THE POLICY WILL BE REDUCED, AND MAY BE COMPLETELY EXHAUSTED BY CLAIM EXPENSES AND, IN SUCH EVENT, THE COMPANY WILL NOT BE LIABLE FOR CLAIM EXPENSES OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT TO THE EXTENT THAT SUCH COSTS EXCEED THE LIMITS OF LIABILITY IN THE POLICY; AND

(III) UNLESS AMENDED BY ENDORSEMENT, CLAIM EXPENSES WILL BE APPLIED AGAINST THE DEDUCTIBLE.

**WARRANTY**

The undersigned warrant to the Company that they understand and accept the notice stated above and that the information contained herein is true and will be the basis of the policy and deemed incorporated therein, should the Company evidence its acceptance of this application by issuance of a policy. The undersigned authorize the release of claim information from any prior insurer to the Company or affiliates thereof.

This application is signed by undersigned authorized agent of the applicant(s) on behalf of the applicant(s) and its, owners, partners, directors, officers, and employees.

This application must be signed by the owner, principal, partner, executive officer, or equivalent within 60 days of the proposed effective date.

Vincent Sliwoski
_____
Name of applicant

_____
Signature of applicant

(Florida only) Agent license number: _____

Managing Partner
_____
Title

10/11/2022
_____
Date

# EXHIBIT B

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

REPUBLIC OF HAITI,

*Plaintiff,*

-against-

HARRIS SLIWOSKI LLP, DAN HARRIS, and
JOHN B. MCDONALD,

*Defendants.*

Index No.: 161725/2023

**COMPLAINT**

Plaintiff the Republic of Haiti (the "Republic"), for its Complaint against Defendants

Harris Sliwoski LLP, formerly Harris Bricken Sliwoski LLP ("Harris Sliwoski"), Dan Harris,

and John McDonald (collectively, "Defendants"), alleges as follows:

## NATURE OF ACTION

1.      This is a legal malpractice action involving shockingly negligent litigation

conduct by a law firm that claimed, without Plaintiff's knowledge or authority, to represent

Plaintiff then failed to make the most basic argument on Plaintiff's behalf that would have

avoided the subsequent entry of a $31 million judgment against Plaintiff.

2.      Defendants were counsel to non-party Bureau de Monétisation des Programmes

d'Aide au Développement ("BMPAD"), an independent agency of the Haitian government, in

connection with a New York arbitration entitled *Preble-Rish Haiti SA v. Republic of Haiti,*

*Bureau de Monétisation de [sic] Programmes d'Aide au Développement* (the "Arbitration").  In

the Arbitration, claimant Preble-Rish Haiti, S.A. ("Preble-Rish") claimed that BMPAD had

breached three contracts for delivery by Preble-Rish to BMPAD of petroleum products.  The

three contracts had an arbitration clause. The sole parties to the contracts were Preble-Rish as

seller, and BMPAD as buyer. The Republic was not a party to the contracts.

3.      In response to Preble-Rish's arbitration demand to BMPAD, Defendants brought

a petition to stay the arbitration in New York State Supreme Court, New York County, entitled

*Republic of Haiti, Bureau de Monétisation de [sic] Programmes d'Aide au Développement v.*

*Preble-Rish Haiti SA*, Index No. 657237/2020 (the "Stay Proceeding"). Defendants were

counsel to BMPAD, but purported to bring the Stay Proceeding on behalf of both BMPAD and

the Republic—repeatedly claiming to represent the Republic even though the Republic had

neither retained Defendants nor authorized them to make such representations. The Republic did

not learn until much later of Harris Sliwoski's unauthorized claim to represent the Republic in

the Stay Proceeding.

4.      While the arbitration was pending, Harris Sliwoski admitted in a publicly filed

letter to the U.S. Court of Appeals for the Second Circuit, in connection with an appeal involving

Preble-Rish, that it was never authorized to represent the Republic. Even though the firm

admitted that it had learned in July 2021 that it was not authorized to represent the Republic, the

firm did not so inform the Justice presiding over the then-pending Stay Proceeding, did not

inform the First Department when it later appealed the lower court's denial of a stay, and

continued to claim to represent the Republic in the Stay Proceeding and at the arbitration hearing

held seven months later in February 2022.

5.      While claiming to represent the Republic, Harris Sliwoski failed to make a

fundamental and dispositive argument on the Republic's behalf – namely, that the Republic was

not a party to the arbitration agreement between Preble-Rish and BMPAD. Had Harris Sliwoski

made this argument—one obvious to any competent lawyer—the court in the Stay Proceeding

would have been required to issue a permanent stay of arbitration as against the Republic.

Instead, the arbitration proceeded, with Harris Sliwoski continuing to claim it was representing

the Republic while failing to argue to the arbitrators that the Republic was not a party to the

arbitration agreement.

6.      Harris Sliwoski also failed to make another dispositive argument that would have

prevented Preble-Rish from pursuing arbitration against the Republic.  In a cross motion to

Harris Sliwoski's petition to stay the arbitration, Preble-Rish moved to compel arbitration.

Under CPLR 7503(a), however, only a party "aggrieved by the failure of another to arbitrate"

has standing to move to compel arbitration.  As the case law explains, for a party to be

"aggrieved," there must exist either (i) a pending court action by the party resisting arbitration on

the subject covered by the arbitration agreement, or (ii) an order to arbitrate by the arbitrators

directed against the party resisting arbitration.  Neither circumstance existed when Preble-Rish

cross moved to compel arbitration. Nor, of course, could Preble-Rish have been "aggrieved" by

the Republic's failure to arbitrate when it was not a party to the arbitration agreement.

Nonetheless, Harris Sliwoski failed to argue in response to Preble-Rish's cross motion that

Preble-Rish was not "aggrieved" as to the Republic and that, accordingly, Preble-Rish lacked

standing to compel arbitration against it.

7.      The arbitrators awarded Preble-Rish over $28 million, jointly and severally

against BMPAD and the Republic.  Preble-Rish brought a petition to confirm the award in the

Southern District of New York, entitled *Preble-Rish Haiti, S.A. v. Republic of Haiti, Bureau de

Monétisation des Programmes d'Aide au Développement*, No. 22-cv-7503 (PKC) (the "SDNY

3

Action"). The district court confirmed the Award and entered judgment against BMPAD and the Republic, jointly and severally, for $31,076,396.85, including pre-judgment interest.

8.      Defendants' negligence caused the entry of the $31 million judgment against the Republic. Had Defendants made the obvious and dispositive arguments that the Republic was not a party to the arbitration agreement between Preble-Rish and BMPAD, and that Preble-Rish was not "aggrieved" by any failure to arbitrate by the Republic, the state court would have granted the stay petition and denied the motion to compel as to the Republic. There would have been no arbitration, no award, no judicial confirmation, and no $31 million judgment against the Republic.

## PARTIES

9.      Plaintiff the Republic of Haiti is the sovereign nation of Haiti.

10.      Harris Sliwoski LLP, formerly known as Harris Bricken Sliwoski LLP, is a limited liability partnership in the business of practicing law, whose partners, upon information and belief, reside in the United States and abroad. Its principal office is at 600 Stewart Street, Suite 1200, Seattle, Washington. At all relevant times, the firm maintained an office in Manhattan, in New York County. The firm held out its Manhattan office address as 27 E. 21st Street; New York, NY 10010.

11.      Defendant Dan Harris, an individual, is a partner at Harris Sliwoski, and, upon information and belief, resides in Washington State. Harris was one of the architects of his firm's litigation strategy in the Stay Proceeding and the Arbitration, and signed multiple pleadings and papers in the Arbitration.

4

12. Defendant John B. McDonald, an individual, is a former partner at Harris Sliwoski, and, upon information and belief, resides in Washington State. McDonald is a member of the New York bar. McDonald was another architect of his firm's litigation strategy in the Stay Proceeding and the Arbitration. He signed all of Harris Sliwoski's court filings in the Stay Proceeding and multiple pleadings and papers in the Arbitration.

## JURISDICTION AND VENUE

13. The Republic designates New York County as the place of trial. Venue is proper in New York County pursuant to CPLR § 503(a) because a substantial part of the events or omissions giving rise to the claims occurred here and because none of the parties resides in the state.

14. Venue is also proper pursuant to CPLR § 509.

15. This Court has jurisdiction over Defendants pursuant to CPLR §§ 301, 302(a)(1), 302(a)(2), and 302(a)(3) because they have continuous and systematic business in New York State, transact business within New York State and contract to supply services in New York State; committed tortious acts within New York State; and committed a tortious act outside New York State causing injury within the State.

## FACTUAL BACKGROUND

### A. The Contracts Between Preble-Rish And BMPAD

#### 1. The Contract Subject Matter And Parties

16. The underlying dispute in the Arbitration arose under three contracts between Preble-Rish and BMPAD, an independent and autonomous government agency of the Republic. Under the three contracts (a "Contract" or, collectively, the "Contracts"), Preble-Rish agreed to

provide BMPAD with deliveries of diesel fuel, jet fuel, and gasoline over a period of six months. The only signatories to the Contracts were Preble-Rish and BMPAD; **the Republic was neither a party nor a signatory** to the Contracts. The three Contracts, in English translation and in the original French, are attached hereto as Exhibits 1, 1.1, 2, 2.1, 3, and 3.1.

17.     Each Contract, at p.1, specifically notes that BMPAD is an "autonomous organization" and each was signed on behalf of BMPAD only by Fils Aimé Ignace Saint Fleur, the Director General of BMPAD.

18.     BMPDAD's organizing legislation is publicly available and makes clear that BMPAD is an autonomous agency, with an independent legal status and its own financial and administrative autonomy. This fact among others should have alerted Harris Sliwoski to understand that the fact that it was representing BMPAD did not mean it was representing the Republic. Public legislation also makes clear that only the Ministry of Economy and Finance is authorized to bind the Republic.

## 2. The Arbitration Clause

19.     Each of the three Contracts included an identical arbitration clause for resolution of disputes between Preble-Rish and BMPAD (the "Arbitration Agreement"), which stated in relevant part:

Article 20.  ARBITRATION AND LEGISLATION

In the event of a dispute between the Buyer [BMPAD] and Seller [Preble-Rish] under this Contract, the dispute shall be submitted by either party to arbitration in New York before three arbitrators. The Party initiating the arbitration shall provide written notice of its intention to submit the matter to arbitration. . . . The decision of the arbitrators shall be final, conclusive and binding on all Parties. Judgment upon such award may be entered in any court of competent jurisdiction. . . .

6

(Exhibits 1 at 11, 2 at 12, and 3 at 11).

**B.**    **Preble-Rish's Arbitration Demand**

20.    On November 20, 2020, Preble-Rish issued a Notice Demanding Arbitration under the Contracts, (the "Arbitration Demand", attached hereto as Exhibit 4). The Arbitration Demand was addressed to BMPAD only, and was sent by e-mail to BMPAD's Managing Director, Mr. Fils Aimé Saint Fleur, at his official governmental email addresses. Upon receiving an arbitration demand, any competent lawyer would have checked to see whether his client was in fact a party to the claimed arbitration agreement. Even if Defendants wrongly believed they were representing the Republic, by exercising only the most minimal level of care Defendants would have immediately understood that the Republic was not amenable to arbitration.

21.    The Arbitration Demand did not contain the warning specified in CPLR § 7503(c) "stating that unless the party served applies to stay the arbitration within twenty days after such service he shall thereafter be precluded from objecting that a valid agreement was not made."

22.    Preble-Rish pursued the arbitration and three arbitrators were appointed.

23.    On December 4, 2020, Mr. Harris sent a letter to the arbitration panel. The letter identified Harris Sliwoski (then Harris Bricken) as counsel for the "Government of Haiti" and BMPAD and stated objections to the arbitration. (Exhibit 5). The objections failed to note or argue that the Republic was not a party to the Contracts between Preble-Rish and BMPAD.

24.    Harris Sliwoski's claim that it was representing the Republic was unauthorized and unknown to the Republic.

7

25.     The Republic only learned of Harris Sliwoski's false assertion that it was representing the Republic in or around February 2022.

**C.     Harris Sliwoski's State Court Petition To Stay The Arbitration**

26.     Shortly after Mr. Harris' December 4, 2020 letter, on December 22, 2020, Harris Sliwoski filed a petition in New York state court to stay the arbitration pursuant to CPLR § 7503(b) ("Stay Petition", attached hereto as Exhibit 6).  The firm also filed an accompanying memorandum of law in support of the requested stay of arbitration (attached hereto as Exhibit 7).

27.     The case was assigned to Justice Andrew Borrok.

> **(1) Harris Sliwoski Claimed To Represent The Republic Even Though It Was Never Retained Or Authorized To Do So**

28.     Harris Sliwoski purported to bring the Stay Petition on behalf of "Petitioners, REPUBLIC OF HAITI ('ROH'), BUREAU DE MONÉTISATION DE [sic] PROGRAMMES D'AIDE AU DÉVELOPPEMENT ('BMPAD')."  In the signature block of the Stay Petition, Harris Sliwoski identified the firm as "Attorneys for Republic of Haiti *and* Bureau de Monétisation de Programmed D'Aide Au Développement." Exh. 6 at 4 (emphasis added).  In its signature block on the firm's accompanying memorandum of law, Harris Sliwoski similarly identified itself as "Attorneys for Republic of Haiti *and* Bureau de Monétisation de Programmes D'Aide Au Développement." Exh. 7, at 8 (emphasis added).  As noted, the Republic did not learn until much later of Harris Sliwoski's unauthorized claim to represent the Republic in the Stay Proceeding.

> **(2) Harris Sliwoski Failed To Argue The Republic Was Not A Party To The Arbitration Agreement**

8

29.     CPLR § 7503(b), pursuant to which Harris Sliwoski brought the Stay Petition, allows for a stay of arbitration where, among other grounds, "a valid agreement was not made."

30.     Nonetheless, Harris Sliwoski failed to argue in the Stay Petition or its accompanying memorandum of law that the arbitration should be stayed as to the Republic on the ground that a valid arbitration agreement did not exist between the Republic and Preble-Rish, given that the Republic was not a party to the Arbitration Agreement.

31.     Instead, the Stay Petition argued only that (1) the Arbitration Demand was procedurally deficient because it had not been properly served under New York law or translated into French and Haitian Creole, and that (2) the Arbitration Agreement was invalid under Haitian law. (Exh. 6 at 3). The memorandum of law was similarly limited to arguing these two legal points as a basis to stay the arbitration. (Exh. 7 at 5-8).

32.     Even worse, Harris Sliwoski falsely represented to the court that the Republic *was a party* to the Contracts when, in fact, it was not. *See* Exh. 6, at 2, ¶ 2 ("Petitioners Republic of Haiti and Bureau de Monétisation de[s] Programmes D'Aide Au Développement are Haitian entities located in the Republic of Haiti. *Petitioners have a contract for product with Respondent*.") (emphasis added).

### (3) Harris Sliwoski Failed To Argue That Preble-Rish Lacked Standing To Compel Arbitration Because As To The Republic It Was Not "Aggrieved"

33.     In addition, when Preble-Rish cross-moved to compel arbitration, Harris Sliwoski failed to challenge Preble-Rish's standing to move to compel on the ground that Preble-Rish was not "aggrieved" within the meaning of CPLR § 7503(a). The court lacks jurisdiction to compel arbitration where the party moving to compel is not "aggrieved."

9

34.     CPLR § 7503(a) states that a "party aggrieved by the failure of another to arbitrate may apply for an order compelling arbitration." The term "aggrieved" has been interpreted to require the existence of either (i) a pending court action by the party resisting arbitration on the subject covered by the arbitration agreement, or (ii) an order to arbitrate by the arbitrators directed against the party resisting arbitration.

35.     At the time Harris Sliwoski brought the Stay Petition, however, the Republic had not initiated a court action on the subject of any arbitration agreement with Preble-Rish—since the Republic had no arbitration agreement with Preble-Rish. Nor had the Republic ever been ordered to arbitrate against Preble-Rish by any arbitrator or arbitration panel.

36.     Further, it is beyond cavil that where, as here, there is no arbitration agreement, the moving party cannot be "aggrieved" by the refusal to arbitrate.

37.     Thus, Harris Sliwoski failed to raise two dispositive arguments in the Stay Proceeding. First, the firm failed to argue, as a basis for permanently staying the arbitration as against the Republic, that the Republic was not a party or signatory to the Arbitration Agreement. In addition, Harris Sliwoski failed to oppose Preble-Rish's motion to compel arbitration, or to move to dismiss that motion, on the ground that Preble-Rish was not "aggrieved" within the meaning of CPLR § 7503(a). As explained above, since Preble-Rish was not "aggrieved" it lacked standing to bring a motion to compel arbitration against the Republic. Had either or both of these arguments been made, the state court would have been required to grant the stay petition and deny the motion to compel as to the Republic.

38.     On September 27, 2021, Justice Borrok issued an order denying the Stay Petition and granting Preble-Rish's cross-motion to compel arbitration, concluding that "'petitioners

10

fail[ed] to establish that the arbitration provisions are illegal under Haitian law.'" ("Stay Petition

Order", Exhibit 8).  Moreover, Justice Borrok held, "it is beyond dispute that the parties freely

and unequivocally agreed to arbitrate all their disputes in New York."  (*Id.* at 1).

39.     On October 27, 2021, Harris Sliwoski appealed the State Court Stay Petition

Order to the First Department.  In its Notice of Appeal Harris Sliwoski again identified itself, in

its signature block, as "Attorneys for Republic of Haiti *and* Bureau de Monétisation de[s]

Programmes D'Aide Au Développement." (emphasis added)—even though, as described below,

*by its own admission the firm knew as of July 2021 that it was not authorized to represent the*

*Republic*.

40.     In its appeal briefs to the First Department, filed in January and February 2022,

the firm also identified itself in its signature block as "Attorneys for Republic of Haiti *and*

Bureau de Monétisation de[s] Programmes D'Aide Au Développement." (emphasis added).  The

First Department affirmed the State Court's Stay Petition Order.

### D.     In The Arbitration, Harris Sliwoski Never Raises The Fact That The Republic Is Not A Party To The Arbitration Agreement

41.     During 2021 while the Stay Petition was pending before Justice Borrok, the

arbitration proceeded.  Harris Sliwoski made various legal arguments but at no time did the firm

argue to the arbitrators that the Republic was not a party to the arbitration agreement.

42.     For example, in a pleading submitted on March 27, 2021, Harris Sliwoski argued,

on behalf of both the Republic and BMPAD, which it collectively defined as "ROH", that the

entities did not recognize the panel's jurisdiction. However, Harris Sliwoski failed to argue that

the Republic was not a party to the Contracts.

43.     On April 5, 2021, the arbitration panel determined the Arbitration could proceed despite the pending Stay Proceeding, noting in an email "in its [Stay Proceeding] motion papers, ROH does not dispute that the parties entered into agreements containing an arbitration clause…".  Harris Sliwoski did not contest this ruling.

44.     On April 23, 2021, Harris Sliwoski on behalf of (purportedly) the Republic and BMPAD, submitted Respondents' Initial Statement of Defense, Counterclaims, Reservation of Rights, and Response to Request for Security; the Affidavit of Fils Aimé Ignace Saint-Fleur, Director General of BMPAD, dated April 23. 2021; and related exhibits.  Again, Harris Sliwoski did not raise the argument that the Republic was not party to the Arbitration Agreement.

45.     Nor did Harris Sliwoski do so in its October 26, 2021 Amended Statement of Defense, Counter-Claims, Reservation of Rights and Response to Request for Security, in which Harris Sliwoski again referred to "Respondents" and "Respondents and Counter-Claimants Republic of Haiti ("ROH") and [BMPAD]…"

### E.     The Partial Final Arbitration Award And Preble-Rish's Petition To Confirm

46.     On August 6, 2021, the arbitration panel issued a "partial final award" in the amount of $23,043,429.79 (the "Partial Final Award"), as "pre-award security" in favor of Preble-Rish. The Partial Award stated that it was issued against "BMPAD," a defined term the arbitrators created to refer to "Respondent, Republic of Haiti, Bureau de Monétisation de[s] Programmes d'Aide au Développement."

47.     On August 9, 2021, Preble-Rish filed a petition in the Southern District of New York to confirm the Partial Final Award (the "Partial Final Award SDNY Action").  The Petition claimed that it was being brought against BMPAD and the Republic.

12

48. Harris Sliwoski appeared in opposition to the petition on behalf of BMPAD only and did not purport to represent the Republic.

49. On February 3, 2022, the Clerk entered an Amended Judgment "as against respondents the Republic of Haiti and the Bureau de Monétisation des Programmes d'Aide au Développement (collectively, 'BMPAD'). Final judgment is entered for [Preble-Rish] as against BMPAD" (the "Partial Final Award Judgment", Exhibit 9). The Republic had not been served or appeared in the case before entry of the Partial Final Award Judgment.

50. Later in February 2022, the Republic learned for the first time that Harris Sliwoski had been claiming to represent the Republic in litigation and arbitration, and learned that the Partial Final Award Judgment had been entered against it.

51. In an effort to unwind the effects of Harris Bricken's negligent failure to at any point argue that the Republic was not a party to the Arbitration Agreement—which as of February 2022 had resulted in entry of a $23 million judgment against it—in February 2022 the Republic retained the undersigned counsel.

52. On February 22, 2022, the Republic moved under Federal Rules of Civil Procedure 60(b) and 59(e) for relief from the Partial Final Award Judgment or to alter and amend the judgment. The motion argued, among other things, that the district court lacked subject matter and personal jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq.* ("FSIA"), because the Republic was not a party to the Arbitration Agreement.

53. In an order dated July 20, 2023, the district court denied the Republic's post-judgment motion.

13

**F.** **The Arbitration Hearing And The Final Arbitration Award**

54.     Meanwhile, on February 7, 2022, an arbitration hearing was held by videoconference.  Harris Sliwoski appeared for BMPAD and claimed to appear for the Republic, even though, as explained below, by July 2021, Harris Sliwoski knew it was not authorized to represent the Republic.

55.     Harris Sliwoski's appearance, like its earlier appearances and submissions, was unauthorized and unknown to the Republic.

56.     At the arbitration hearing Harris Sliwoski again failed to argue that the Republic was not a party to the Contracts and that therefore the arbitrators had no jurisdiction over the Republic.

57.     Having learned of the arbitration and Harris Sliwoski's false and unauthorized claim to be representing the Republic, on February 23, 2022, the Republic, via the undersigned counsel, submitted a letter to the arbitration panel as part of its effort to undo the effects of Harris Sliwoski's negligent failure to challenge arbitrability in the state court or the arbitration, on the ground that the Republic was not a party to the Arbitration Agreement.

58.     The Republic's letter pointed out that the Republic was not a party to the Arbitration Agreement and that the Partial Final Award, accordingly, could not be understood to run against the Republic.  Full briefing then ensued by Preble-Rish and the Republic on the question whether the dispute was arbitrable against the Republic.  The Republic argued that because the Republic was not a party to the Arbitration Agreement the dispute was not arbitrable and further that the arbitrators lacked jurisdiction to decide the arbitrability question, which had to be decided by a court under U.S. Supreme Court and other settled precedent.

14

59.     On August 23, 2022, the arbitrators issued a Corrected Final Award (the "Final Award"). In the Final Award, the arbitrators awarded Preble-Rish a total of $28,184,756.65 against BMPAD and the Republic, jointly and severally.

60.     The arbitrators took jurisdiction of the arbitrability issue and ruled that the Republic had waived its "non-signatory" defense to arbitrability, based on Harris Sliwoski having failed to raise the argument in the Stay Petition or in the arbitration.

### G. The Petition To Confirm, The Republic's Opposition, And The District Court's Decision Confirming The Final Award

61.     On September 1, 2022, Preble-Rish filed a petition to confirm the Final Award (the "Petition") in the Southern District of New York, captioned *Preble-Rish Haiti SA v. Republic of Haiti, Bureau de Monétisation des Programmes d'Aide au Développement*, Case No. 22-CV-7503 (as noted, the "SDNY Action").

62.     In its continuing effort to undo the effects of Harris Sliwoski's malpractice, the Republic opposed the Petition and also moved to dismiss the Petition for lack of subject matter and personal jurisdiction, and improper service, under the FSIA, or, in the alternative, to vacate the Final Award on the grounds that the arbitrators exceeded their powers in finding the dispute arbitrable against the Republic as a non-signatory to the Arbitration Agreement.

63.     All of the Republic's arguments for dismissal or vacatur were predicated on the fact that the Republic is not a party to the Arbitration Agreement.

64.     As to subject matter jurisdiction, the Republic argued that the arbitration exception to the Republic's sovereign immunity under the FSIA did not apply because the Republic is not a party to the Arbitration Agreement. Under the arbitration exception to sovereign immunity under the FSIA and Second Circuit case law, in order for the arbitration

exception to apply the foreign sovereign must be a party to the arbitration agreement at issue. Since the Republic was not a party to the Arbitration Agreement, no exception to the Republic's sovereign immunity applied.

65.      In an Order dated June 29, 2023, the district court granted Preble-Rish's Petition and denied the Republic's motion to dismiss or vacate the Final Award.  (Exhibit 10).

66.      The court ruled that the Republic's arguments for dismissal were "barred by principles of res judicata," based on the Stay Petition Order.  (*Id.* at 15, 17).

67.      The court reasoned that Harris Sliwoski could have raised the lack of an arbitration agreement between Preble-Rish and the Republic in its Petition to Stay before Justice Borrok, but because it failed to do so, the Republic was "precluded from relitigating issues that were or could have been raised in that proceeding."  (*Id.* at 17).

68.      Accordingly, the court concluded that the Republic "cannot now deny that it had valid arbitration agreement with PRH [Preble-Rish]," and "is not entitled to FSIA immunity." (*Id.*).

69.      The court applied the same preclusion analysis to the Republic's alternative motion to vacate the Award, declining to consider the merits of the Republic's arguments that the arbitrators exceeded their powers by deciding the question of arbitrability against the Republic as a non-party to the Contracts.  (*Id.* at 23).

70.      Rather, because arbitrability had been determined by Justice Borrok, the Republic was precluded "from relitigating issues that were or could have been raised in" the Stay Petition. (*Id.* at 23-24).

16

71.     Finally, the court rejected the Republic's argument of improper service under the FSIA and thus concluded that it had personal jurisdiction over the Republic. (*Id.* at 18-21).  The court held that the Contracts contained a "special arrangement for service," 28 U.S.C. § 1608(a)(1), allowing for "correspondence between the Parties subject to this Contract" to be delivered by email to the Executive Director of BMPAD.  The court found that the Petition had been emailed to the Executive Director of BMPAD on October 6, 2022. (*Id.* at 19-20).  The court again rejected the Republic's arguments that it could not be subject to any "special arrangement" for service because it is not a party to the Contracts, on the ground that the argument was precluded by the Stay Petition Order. (*Id.* at 21).

72.     The district court also declined to consider the Republic's arguments that Harris Sliwoski's lack of actual or apparent authority meant the Republic could not be bound by the Stay Petition Order. (*Id.* at 17-18).

73.     The court then granted the petition to confirm and denied the Republic's motion to vacate. (*Id.* at 24).

74.     Final Judgment was entered on July 20, 2023, in the amount of $31,076,396.85, jointly and severally against the Republic and BMPAD. (Exhibit 11).

75.     Thus, Harris Sliwoski's failure to argue in the Stay Proceeding that the Republic was not a party to the Arbitration Agreement resulted in the district court entering a $31 million judgment against the Republic.

**H. Harris Sliwoski Has Admitted It Was Never Authorized To Represent The Republic Yet Continued To Claim It Was Representing The Republic Even After Learning It Had No Authority**

76.     Harris Sliwoski conceded in a letter to the U.S. Court of Appeals for the Second Circuit, dated February 22, 2022, that it never had authority to represent the Republic. (Exhibit 12).  This letter was filed in connection with an appeal that also involved Preble-Rish and Harris Sliwoski's client BMPAD.

77.     Specifically, Mr. McDonald informed the Court that "[i]t came to our attention in or around July 2021 that my firm had not been properly retained to have the authority to represent the Republic in several litigation matters in the United States… Before July 2021 [the] firm had the understanding that we were authorized to represent the Republic, but this was incorrect." (*Id.*)

78.     In any event, Defendants should have known, before realizing in July 2021, that they had no authority to represent the Republic.  No one among the Republic's representatives ever had any contact with Harris Sliwoski.  In addition, Haitian law, which is public and readily available to any diligent attorney, makes clear that only the Ministry of Economy and Finance may enter into an agreement to bind the Republic.  Defendants made arguments from Haitian law in support of their Stay Petition, but never bothered to consult Haitian law that would have shed light on who their client was, and that it could not be the Republic.

79.     Nonetheless, as shown above, even after July 2021 Harris Sliwoski did not inform Justice Borrok, before whom the Stay Proceeding was pending, that the firm did not in fact represent the Republic and had never been authorized to represent the Republic.  Instead, Defendants knowingly allowed the state court to remain under the false impression that the

Republic was a represented party before the court and that it was a party that joined in bringing the Stay Proceeding. Further, Defendants continued to *affirmatively claim* in First Department court filings that it was representing the Republic on the appeal of the State Court Stay Petition Order. Defendants' knowing material omission of fact, and affirmative misrepresentation to the trial court and the First Department directly caused those courts to render adverse decisions against the Republic. Had Defendants informed the courts once they knew, in July 2021, that they were not authorized to represent the Republic in the Stay Proceeding, Defendants' negligent omission of winning, dispositive arguments could not have bound the Republic, either in the Stay Proceeding or the subsequent SDNY litigations, in which the court found Defendants' failure to argue the non-signatory defense dispositive in allowing for liability against the Republic.

## I. The Facts Establishing Harris Sliwoski's Negligence Are Not In Dispute

80.     The material facts establishing Harris Sliwoski's negligence are not in dispute. There is no dispute that, as the firm informed the Second Circuit, it had never been authorized to represent the Republic.

81.     There is also no dispute that (1) the Republic is not a party to the Arbitration Agreement; (2) Harris Sliwoski failed to raise the argument in the Stay Proceeding that the Republic is not a party to the Arbitration Agreement; (3) Harris Sliwoski never raised the argument before the arbitrators that the Republic is not a party to the Arbitration Agreement; (4) in the Final Award the arbitrators ruled that the Republic was barred from arguing against arbitrability because Harris Sliwoski failed to raise the Republic's non-signatory defense in the arbitration; and (5) the SDNY district court denied the Republic's motion to dismiss the Petition to Confirm the Final Award, and its alternative motion to vacate the Final Award, on the ground

19

that the Republic was barred from arguing that the Republic is not a party or signatory to the

Arbitration Agreement because Harris Sliwoski failed to raise that argument in the Stay

Proceeding in state court; (6) the SDNY district court entered a final judgment against the

Republic in the amount of $31,076,396.85.

82.     Finally, there is no dispute that Harris Bricken failed to argue in opposition to

Preble-Rish's motion to compel arbitration that Preble-Rish was not "aggrieved' by any failure

of the Republic to arbitrate, and that Preble-Rish lacked standing to compel arbitration against

the Republic.

## COUNT I

### (Legal Malpractice – Against All Defendants)

83.     Plaintiff repeats and reiterates the previous paragraphs as though set forth fully in

this paragraph.

84.     As set forth above, during their purported representation of the Republic in the

Arbitration and Stay Proceeding, Defendants failed to exercise ordinarily reasonable care, skill,

diligence, and knowledge commonly possessed or exercised by a member of the legal profession.

85.     By claiming to represent the Republic in the Arbitration and the Stay Proceeding,

and purporting to make arguments on its behalf, Defendants are estopped from denying an

attorney-client relationship existed.

86.     Defendants committed multiple acts of malpractice.  First, Defendants incorrectly

claimed to represent the Republic when they did not, and continued to claim to represent the

Republic even after learning in July 2021 that they had no authority to do so. In addition, to the

extent Defendants believed they were representing the Republic, Defendants failed to make basic

arguments on its behalf.  Defendants failed to argue at any point that the Republic was not a party to the Contracts.  Since it is axiomatic that a party cannot be required to submit to arbitration any dispute which it has not agreed to submit, the Republic would have not been required to arbitrate, and would not face the over $31 million liability it now faces, had Defendants timely raised this argument.  In other words, had Harris Sliwoski timely made the argument in its Stay Petition, and in opposition to Preble-Rish's cross-motion to compel, that the Republic was not a party to the Contracts, the Republic would not have been compelled to arbitrate and the Stay Petition would have been granted.  There would have been no arbitration against the Republic.

87.    Defendants also failed to oppose Preble-Rish's cross-motion to compel arbitration even though the requirements of CPLR § 7503(a), *i.e.*, that the movant be "aggrieved," were not met and Preble-Rish therefore lacked standing to compel arbitration against the Republic. Again, had Harris Sliwoski made this argument, the Republic would not have been compelled to arbitrate.  Thus, there would have been no arbitration against the Republic.

88.    Defendants' negligent failure to make these basic arguments for halting the arbitration against the Republic, while claiming to represent the Republic though they were never authorized to do so, caused the Republic to sustain losses of over $31,076,396.85.

89.    The Republic sustained such damages as a direct and proximate result of Defendants' malpractice.

90.    Defendants are liable to the Republic for malpractice, in the principal amount of at least $31,076,396.85, together with applicable interest thereon and additional damages

21

FILED: NEW YORK Case 1:24-cv-00929 RK Document 2 Filed 02/15/24 Page 89 of 93 INDEX NO. 161725/2023

consisting of the legal fees the Republic has incurred in attempting to undo the consequences of Defendants' malpractice.

## COUNT II

### (Negligence - Against All Defendants)

91.     Plaintiff repeats and reiterates the previous paragraphs as though set forth fully in this paragraph.

92.     As set forth above, during their purported representation of the Republic in the Arbitration and Stay Proceeding, Defendants failed to exercise ordinarily reasonable skill and knowledge commonly possessed by a member of the legal profession.

93.     By claiming to represent the Republic in the Arbitration and the Stay Proceeding, and purporting to make arguments on its behalf, Harris Sliwoski undertook a duty to the Republic, which duty defendants breached in several ways.

94.     Defendants committed multiple acts of negligence.  First, Defendants incorrectly claimed to represent the Republic when they did not, and continued to claim to represent the Republic even after learning in July 2021 that they had no authority to do so. In addition, to the extent Defendants believed they were representing the Republic, Defendants failed to make basic arguments on its behalf.  Defendants failed to argue at any point that the Republic was not a party to the Contracts.   Since it is axiomatic that a party cannot be required to submit to arbitration any dispute which it has not agreed to submit, the Republic would have not been required to arbitrate, and would not face the over $31 million liability it now faces, had Defendants timely raised this argument.   In other words, had Harris Sliwoski timely made the argument in its Stay Petition, and in opposition to Preble-Rish's cross-motion to compel, that the

Republic was not a party to the Contracts, the Republic would not have been compelled to arbitrate and the Stay Petition would have been granted. There would have been no arbitration against the Republic.

95.     Defendants also failed to oppose Preble-Rish's cross-motion to compel arbitration even though the requirements of CPLR § 7503(a), *i.e.*, that the movant be "aggrieved," were not met and Preble-Rish therefore lacked standing to compel arbitration against the Republic. Again, had Harris Sliwoski made this argument, the Republic would not have been compelled to arbitrate. Thus, there would have been no arbitration against the Republic.

96.     Defendants' negligence caused the Republic to sustain losses of over $31,076,396.85.

97.     The Republic sustained such damages as a direct and proximate result of Defendants' negligence.

98.     Defendants are liable to the Republic for negligence, in the principal amount of at least $31,076,396.85, together with applicable interest thereon and additional damages consisting of the legal fees the Republic has incurred in attempting to undo the consequences of Defendants' negligence.

### <u>COUNT III</u>

### <u>(Violation of Judiciary Law § 487 – Against All Defendants)</u>

99.     Plaintiff repeats and reiterates the previous paragraphs as though set forth fully in this paragraph.

100.     Under N.Y. Judiciary Law § 487, an attorney who is guilty of any deceit or collusion, or who consents to any deceit or collusion with the intent to deceive the court or any

party, is liable for treble damages to be recovered in a civil action. The making of knowingly false statements to a court gives rise to liability under this statute.

101.    As set forth above, Defendants made knowingly false statements to the motion court and the First Department in the course of the Stay Proceeding. For example, Defendants affirmatively represented that the Preble-Rish "had a contract" with both Petitioners, when in fact Preble-Rish did not have a contract with the Republic, only with BMPAD. No attorney who so much as glanced at the relevant portions of the Contracts upon receiving the Arbitration Demand could have thought the Republic had a contract with Preble-Rish.

102.    In addition, as set forth above, Defendants repeatedly represented to the motion court and the First Department that they were representing the Republic in the Stay Proceeding *even after* they learned in July 2021 that the firm had never been authorized to represent the Republic in litigation or arbitration against Preble-Rish—as Defendants acknowledged in a publicly filed letter to the Second Circuit. Defendants also continued to claim in the Arbitration that they represented the Republic even after learning in July 2021 that they were never authorized to do so.

103.    Scienter need not be inferred: scienter exists when a law firm knows it is not authorized to represent a party but continues to falsely claim it represents the party.

104.    As set forth above, Defendants' repeated, knowing false statements caused the Republic to sustain losses of over $31,076,396.85.

105.    As a result, Defendants are liable to Plaintiff for treble damages, or more than $93,000,000.

## RELIEF REQUESTED

**WHEREFORE,** the Republic demands that judgment be entered in its favor:

A.       On Count I, for malpractice, against Defendants, in an amount to be proven at trial but at a minimum of $31,076,396.85, plus the additional damages attributable to the Republic's efforts to undo the consequences of the malpractice, together with the costs and disbursements and of this action, applicable interest, attorneys' fees, and such other and further relief as to this Court seems just and proper.

B.       On Count II, for negligence, against Defendants, in an amount to be proven at trial but at a minimum of $31,076,396.85, plus the additional damages attributable to the Republic's efforts to undo the consequences of the negligence, together with the costs and disbursements and of this action, applicable interest, attorneys' fees, and such other and further relief as to this Court seems just and proper.

C.       On Count III, for violation of Judiciary Law § 487, against Defendants, in an amount to be proven at trial but at a minimum of $31,076,396.85, plus the additional damages attributable to the Republic's efforts to undo the consequences of the negligence, all of which should be tripled pursuant to section 487, together with the costs and disbursements and of this action, applicable interest, attorneys' fees, and such other and further relief as to this Court seems just and proper.

Dated: New York, New York
      December 1, 2023

**MADSEN LAW P.C.**

By: ___/s/ Bertrand Madsen_____
     Bertrand Madsen
1115 Broadway, 11th Floor
New York, N.Y. 10010
Tel.: (212) 346-7744
Email: bmadsen@madsenlawpc.com

- and -

**SCHLAM STONE & DOLAN LLP**

By: ___/s/ Elizabeth Wolstein_____
     Elizabeth Wolstein
     Samuel L. Butt
26 Broadway, 19th Floor
New York NY 10004
Tel.: (212) 344-5400
Fax: (212) 344-7677
Email: ewolstein@schlamstone.com
Email: sbutt@schlamstone.com

*Attorneys for Plaintiff Republic of Haiti*

26